REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2358

September Term, 2013

JUSTIN DAVIS

v.

WICOMICO COUNTY BUREAU OF
SUPPORT ENFORCEMENT

Woodward,
Kehoe,
Moylan, Charles E., Jr.
     (Retired, Specially Assigned),

JJ.

Opinion by Woodward, J.

Filed: April 2, 2015

On December 23, 2009, shortly after the birth of twin boys, Jessica Cook and appellant, Justin Davis, signed an affidavit of parentage for each child, attesting that Cook was the mother and appellant was the father of the children. On July 25, 2011, appellee, the Wicomico County Bureau of Support Enforcement ("the Bureau"), filed a complaint seeking an order requiring appellant to pay support for the twins. At a hearing on September 16, 2011, appellant, appearing *pro se*, denied that he was the father of the children and requested a blood test to determine paternity. The circuit court denied the request, determining that by law appellant was the father of the children based on the signed affidavits of parentage. The court then ordered appellant to pay child support. Appellant did not appeal that order.

Two years later, on September 10, 2013, appellant filed a complaint asking the circuit court again to order a blood test pursuant to Sections 5-1029 and 5-1038 of the Family Law Article ("FL"), to strike the finding of paternity by affidavit of parentage, and to set aside the 2011 child support order. The Bureau moved to dismiss the complaint. Treating the motion as one for summary judgment, the court granted summary judgment to the Bureau after a hearing on December 13, 2013.

On appeal, appellant raises one question for our review, which we have rephrased and recast as two questions:[1]

---

[1] Appellant's question as originally presented is:

> Is blood or genetic testing automatically mandated when requested by a putative father who had failed to appeal an adverse paternity order which was based on unreliable Affidavits of Parentage and was issued as part of a paternity hearing without the introduction of blood or genetic tests, where the mother, two years after signing a perjurious

(continued...)

1. Did the circuit court err by granting the Bureau's motion for summary judgment?

2. Did the circuit court err in finding that FL §§ 5-1029 and 5-1038 do not grant appellant an automatic right to a paternity test?

For the reasons stated below, we will affirm the judgment of the trial court.

## BACKGROUND

On December 21 and 22, 2009, twin boys were born to Jessica Cook. On December 23, 2009, Cook and appellant signed an affidavit of parentage for each child in which they attested that appellant was the "natural father" of the children. The children were both given appellant's last name.

On July 25, 2011, the Bureau filed a Complaint for Child Support against appellant, seeking child support based on the signed affidavits of parentage. In response, appellant sent a letter, dated August 4, 2011, to the Bureau, which was later filed with the circuit court and designated as an answer. In the letter, appellant denied that he was the father of the children and that he owed any support to Cook for the children. Appellant alleged that the affidavits of parentage could not establish paternity

> because [appellant's] signature was obtained through fraud or misrepresentation. After Jessica Cook and [appellant] had broken up as a couple, she called [appellant] and said she was pregnant and from what she told [appellant, he] was led to believe that Nicholas Marley

---

(...continued)
> Affidavit of Parentage, admitted that the putative father was not the biological father, and upon learning of the intentionally erroneous Affidavit, he consistently denied paternity and demanded paternity testing?

2

> Davis and Benjamin Davis were [appellant's] children. No one
> explained to [appellant] what significance there was to [appellant]
> signing an Affidavit of Parentage.

Appellant concluded the letter by asking the court to administer a paternity test.

The circuit court held a hearing on September 16, 2011. Appellant appeared *pro se* at the hearing and declined the court's offer to continue the hearing until he could obtain a lawyer. The court determined that appellant knowingly and voluntarily waived his right to an attorney. The court admitted into evidence the two signed affidavits of parentage and heard testimony from Cook and appellant.

Cook testified that she and appellant dated and then broke up before she was pregnant, and that, when they got back together in May 2009, she told appellant that she was two months pregnant. Cook acknowledged in her testimony that in May 2009, she communicated with appellant that "there is a possibility that those children were not his." According to Cook, she "was under the understanding that, you know, regardless of whether or not these were biologically his children that we were going to raise them together." Cook testified that she and appellant remained in a steady relationship throughout the remainder of her pregnancy, and that appellant proposed marriage to her more than once. According to Cook, while at the hospital after she gave birth, she and appellant signed the affidavits of parentage for both children.

Appellant testified that, when he signed the affidavits of parentage, he believed that he was the biological father of the children. Appellant testified, however, that he began to

3

doubt that he was the biological father of the children "afterwards when the children came out visibly, visibly Caucasian." Appellant also testified that there was only a three-week period where he and Cook did not have a sexual relationship prior to getting back together in May of 2009. Appellant asked multiple times during the hearing for a paternity test.

Counsel for the Bureau argued to the trial court that, pursuant to FL § 5-1028, an individual who signs an affidavit of parentage has sixty days to rescind the affidavit; otherwise the only challenge to such affidavit must be based on fraud, duress, or material mistake of fact. The Bureau argued that (1) appellant knew that there was at least a possibility that he was not the father of the children, but he signed the affidavits nonetheless; and (2) the form makes clear to the signatory of the legal responsibilities that one assumes in signing the affidavit.

In response, appellant argued:

> I was lead [sic] to believe the children were mine. That's the only reason why I signed that. So in this case, I'm just asking for a paternity test. That's it. I'm asking for a paternity test to actually prove paternity. I don't feel that me signing a piece of paper in the hospital that I wasn't explained - - I swear, Your Honor, I was never told that by me signing this Affidavit of Parentage that it would hold me binding even though I'm not the father.

The circuit court found Cook's testimony that she had informed appellant before the birth of the possibility that he was not the biological father "irrelevant because [appellant] armed with whatever knowledge he had chose to voluntarily execute an affidavit establishing him as the father of these children." The court noted that there was no evidence before the

4

court "that would even broach the subject of fraud, duress, or . . . material mistake of fact." The court told appellant:

> You were clearly—you meaning, both mother and father, were clearly advised, don't sign if you have a doubt. You can get assistance if you want because you don't understand what you're about to sign. But the moment you affix your pen to that paper and sign your name, you have obligated yourself to these children. And **it is the finding of this Court that there is no fraud, duress, or mistake of material [ ] fact that would justify the rescission of the Affidavits of Parentage properly executed.** These are your children by law, and that's the end of the story.

(Emphasis added).

The trial court then heard evidence regarding child support from a child support specialist with the Wicomico County Child Support office. The court ruled from the bench, ordering that "the father of these children shall be required to pay support from commencing on July 25, 2011 in the amount of $197.00 per month. That Order will last until December 25, 2011. Thereafter, effective January 25, 2012, the father shall pay support for both children in the total amount of $325.00 per month." The court immediately corrected itself and ordered the latter amount amended to $352.50 each month. The court signed an order memorializing the ruling on September 23, 2011. Appellant did not appeal the September 23, 2011 order.

Almost two years later, on September 6, 2013, Cook filed a petition to change the twins' last names from Davis (appellant's last name) to Cook. On September 10, 2013, appellant filed a complaint again asking the court to (1) order a blood test pursuant to

5

FL §§ 5-1029 and 5-1038, (2) strike the finding of paternity by affidavit of parentage pursuant to FL §§ 5-1028(d) and 5-1038(a)(2)(i), and (3) set aside the September 23, 2011 child support order.

The Bureau moved to dismiss the complaint. On December 13, 2013, the circuit court held a hearing on the motion to dismiss, which the parties agreed would be heard as a motion for summary judgment. The court took judicial notice of the court file, including the 2011 proceeding.

At the hearing, the Bureau argued that the trial court should grant summary judgment because *res judicata* barred relitigation of appellant's claims. Appellant, through counsel, argued that a putative father can challenge paternity at any time after a judicial determination of paternity, pursuant to FL § 5-1038, and that the same opportunity should be afforded to an individual who signs an affidavit of parentage. The Bureau argued in response that FL § 5-1038 did not control because appellant signed an affidavit of parentage, and, pursuant to FL § 5-1028, an individual who voluntarily signs an affidavit of parentage cannot later "undo" his parentage by establishing that he is not the biological father of the children.

The circuit court issued an opinion and order on December 20, 2013, granting the Bureau's motion for summary judgment. The circuit court determined that, under the unambiguous language of the statute, the right to a blood test applied only to set aside a judicial declaration of paternity under FL § 5-1038, and not to paternity established by affidavit of parentage under FL § 5-1028. Furthermore, the circuit court held that, "even if

[appellant] had a present right for blood testing, despite paternity having been established by means of affidavits of paternity, he asserted that right repeatedly at the 2011 hearing." The court concluded that appellant had waived his right to a blood test by failing to appeal the 2011 decision.

Appellant filed a timely appeal of the court's December 20, 2013 order.

## DISCUSSION

*Summary Judgment*

We review the decision of a circuit court granting summary judgment *de novo*. *Powell v. Breslin*, 195 Md. App. 340, 345 (2010), *aff'd*, 421 Md. 266 (2011). A trial court shall grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the [moving] party . . . is entitled to judgment as a matter of law." Rule 2-501(f).

> Maryland's summary judgment rule makes clear that a trial court determines issues of law; it makes rulings as a matter of law, resolving no disputed issues of fact. In this regard, the standard for appellate review of a trial court's grant of a motion for summary judgment is simply whether the trial court was legally correct. . . .

*Hamilton v. Kirson*, 439 Md. 501, 522 (2014) (citations and internal quotation marks omitted). "'As such . . . we review independently the record to determine whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law.'" *Id.* (quoting *Tyler v. City of Coll. Park*, 415 Md. 475, 498-99 (2010)). We review the record in the light most favorable to the non-moving party. *Bednar*

7

*v. Provident Bank of Md., Inc*., 402 Md. 532, 542 (2007).

Appellant argues now, as he did at the lower court hearing in 2011 and again at the hearing in 2013, that he should be granted a blood test to prove that he is not the biological father of the children. The Bureau responds that the circuit court properly determined that appellant could not relitigate the issues adjudicated in 2011. According to the Bureau, the doctrine of *res judicata* precludes appellant from again seeking to obtain relief from the court, because his argument is the same as it was in 2011: the court should have ordered a blood test or genetic testing, because Cook lied to him about paternity. We agree with the Bureau.

Under the doctrine of *res judicata*, appellant is barred from relitigating the claims adjudicated in an earlier proceeding. *See Anne Arundel Cnty. Bd. of Educ. v. Norville*, 390 Md. 93, 106 (2005). The Court of Appeals has explained:

> ***Res judicata*** literally means "a thing adjudicated," and **generally indicates "[a]n affirmative defense barring the same parties from litigating a second lawsuit on the same claim, or any other claim arising from the same transaction or series of transactions and that could have been—but was not—raised in the first suit."** BLACK'S LAW DICTIONARY 1336–37 (8th ed. 2004). *See Alvey v. Alvey,* 225 Md. 386, 390, 171 A.2d 92, 94 (1961) (stating that "[t]he doctrine of *res judicata* is that a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit"); *see also Mackall v. Zayre Corp.*, 293 Md. 221, 228, 443 A.2d 98, 102 (1982) (stating that "if a proceeding between parties involves the same cause of action as a previous proceeding between the same parties, the principle of *res judicata* applies and all matters actually litigated or

8

that could have been litigated are conclusive in the subsequent proceeding").

*Lizzi v. Wash. Metro. Area Transit Auth.*, 384 Md. 199, 206-07 (2004) (alterations in original) (emphasis added), *cert. denied*, 545 U.S. 1116 (2005).

Thus the doctrine of *res judicata* bars the relitigation of a claim where:

> (1) [ ] the parties in the present litigation are the same or in privity with the parties to the earlier dispute; (2) [ ] the claim presented in the current action is identical to the one determined in the prior adjudication; and, (3) [ ] there has been a final judgment on the merits.

*Norville*, 390 Md. at 107 (citing, e.g., *Colandrea v. Wilde Lake Comm. Ass'n.*, 361 Md. 371, 392 (2000); Restatement (Second) of Judgments § 19 (1982)).

In the instant case, the trial court wrote:

> The undisputed facts before this court, and also before the trial judge in 2011, are that [appellant] executed affidavits of parentage in 2009 with respect to each of the children in question and did not, within 60 days, rescind the affidavits as permitted by FL § 5-1028(d)(1). As a result, under the clear and unambiguous language of the statute, [appellant] could contest the affidavit of parentage in court "only on the basis of fraud, duress, or material mistake of fact". At the 2011 hearing in this case, [appellant] did just that. After hearing the evidence and arguments, the trial judge ruled against him, stating that "[w]e have heard nothing in this record and before this Court today that would even broach the subject of fraud, duress or material mistake of fact."

> \*\*\*\*\*

> [E]ven if [appellant] had a present right for blood testing, despite paternity having been established by means of affidavits of paternity, he asserted that right repeatedly at the 2011 hearing. The trial judge did not explicitly address the request in his decision but his decision implicitly denied the relief. If [appellant] disagreed with the trial

judge's failure to grant the requested relief, the time to have contested it was then, by a timely appeal—not almost two years later by the present Complaint.

As implied by the trial court, appellant's claim is barred by the doctrine of *res judicata*. Considering the first element of *res judicata*, the parties in the instant litigation are the same as in the 2011 litigation: appellant, Cook, and the Bureau. Second, as the trial court noted, appellant's claim in the instant litigation is identical to his claim in the 2011 litigation: appellant argued that he was entitled to a blood test because Cook lied to him about the paternity of the children. Finally, there was a final judgment on the merits at the 2011 hearing: the trial court made a finding of paternity based on the affidavits of parentage and ordered appellant to pay child support. Appellant did not appeal that order. Therefore, *res judicata* precludes appellant from litigating the same claim in the instant case that he raised in the 2011 litigation. Accordingly, the trial court did not err in granting summary judgment in favor of the Bureau.[2]

---

[2] We note that in his reply brief, appellant asserts for the first time that the Bureau committed extrinsic fraud by failing to disclose to the trial court that before the 2011 hearing, appellant had requested paternity testing to prove that he was not the biological father of the children and that Cook admitted to the Bureau that appellant was not the biological father. Such claim is not preserved for our review, because (1) appellant never argued below that there was extrinsic fraud; and (2) appellant did not argue it in his opening brief. *See Chang v. Brethren Mut. Ins. Co.*, 168 Md. App. 534, 550 n.7 (rejecting an argument that appeared only in appellants' reply brief on the grounds that Rule 8-504(a)(5) requires a party to argue all points of appeal in its opening brief), *cert. denied*, 394 Md. 308 (2006). We also note that appellant never filed a motion under Rule 2-535(b) asking the lower court to set aside the 2011 order; thus any argument that the court should vacate the 2011 order due to fraud, mistake, or irregularity is waived.

Even if appellant's claim was not barred by *res judicata*, we agree with the circuit

court that appellant has no automatic right to blood or genetic testing pursuant to the statute.

Subtitle 10 of Title 5 of the Family Law Article governs "Paternity Proceedings."

Paternity may be established either by a judicial "declaration of paternity" under FL §§ 5-

1032, *et seq.*, or by an "affidavit of parentage" under FL § 5-1028, without court action.  As

the trial court explained in its opinion in the instant case, paternity was established pursuant

to FL § 5-1028, "which constitutes a legal finding of paternity . . . without any court action."

FL § 5-1028 states in relevant part:

> (d)     *Execution constitutes legal finding of paternity—*
>
> > (1)     **An executed affidavit of parentage constitutes a legal finding of paternity, subject to the right of any signatory to rescind the affidavit:**
> >
> > > (i)     **in writing within 60 days after execution of the affidavit**; or
> > >
> > > (ii)      in a judicial proceeding relating to the child:
> > >
> > > > 1.     in which the signatory is a party; and
> > > >
> > > > 2.     that occurs before the expiration of the 60-day period.
> >
> > (2)     (i)     **After the expiration of the 60-day period, an executed affidavit of parentage may be challenged in court only on the basis of fraud, duress, or material mistake of fact.**

11

> (ii) The burden of proof shall be on the challenger to show fraud, duress, or material mistake of fact.

(Bold emphasis added).

Appellant admits that he signed an affidavit of parentage for each child. At the top of each affidavit is a section titled "Important Notice to Parents," which states the following:

1. **A completed Affidavit of Parentage is a legal document and constitutes a legal finding of paternity.**

2. Completion of the Affidavit is voluntary. Do not complete this Affidavit until you have read or have had read to you, the instructions for completion and the notice regarding your rights and responsibilities.

3. The Affidavit may not be signed by the biological mother if she was legally married at the time of conception or birth of the child. The Affidavit may be signed by the father regardless of his marital status.

4. If either of you is not sure that the man signing the Affidavit is the biological father of the child, you should not complete the Affidavit at this time. You should first have a genetic test. Genetic testing can provide certainty if you have any doubts regarding the parentage of the child.

5. If you are under the age of eighteen (18), you may complete the Affidavit without the permission of an adult or legal guardian. You may want to seek the advice of a parent or legal guardian before signing this form.

6. This Affidavit creates legal rights and obligations relating to your child, and may impact custody, child support and visitation. Therefore, it may be beneficial to talk to a lawyer before signing the Affidavit.

(Emphasis in original).

12

Above appellant's signature on each form, it reads:

> **I acknowledge that I am the natural father of the child named above.** I solemnly affirm under penalties of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information and belief. **I understand that this affidavit will establish paternity of the child and will authorize the entry of my name on the child's birth certificate.** I have read or had read to me the notice regarding the legal rights and obligations resulting from acknowledging paternity. **I understand that I am free to refuse to sign this admission of paternity.**

(Emphasis added).

FL § 5-1038, on the other hand, governs the finality of declarations of paternity, and provides:

> (a) *Declaration of paternity final; modifications.—*
>
> (1) **Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.**
>
> (2) (i) **A declaration of paternity may be modified or set aside**:
>
> > 1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or
> >
> > 2. **if a blood or genetic test done in accordance with § 5-1029 of this subtitle establishes the exclusion of the individual named as the father in the order.**

13

(ii)     Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

(b)     *Other orders subject to modification*. — Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

(Bold emphasis added).

FL § 5-1029, referred to in FL § 5-1038(a)(2)(i)(2), provides in relevant part:

(a)     *Requests and orders for tests.—*

(1)     The Administration may request the mother, child, and alleged father to submit to blood or genetic tests.

(2)     If the mother, child, or alleged father fails to comply with the request of the Administration, the Administration may apply to the circuit court for an order that directs the individual to submit to the tests.

(b)     *In general.* — On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.

Appellant relies heavily on FL §§ 5-1029, -1038(a)(2)(i)(2), and *Langston v. Riffe*, 359 Md. 396 (2000), to argue that in *any* paternity proceeding, the putative father has the right to a mandatory blood or genetic testing. According to appellant, this is particularly true in cases like his, where he alleges that he was deceived by "a mother's commission of fraud

14

or outright perjury just to name someone as the father." Appellant's reliance is misplaced.

In the instant case, the trial court reviewed the relevant statutes and determined the statutory scheme to be "clear and unambiguous that the right to a blood test applies only when there is an attempt to set aside or modify a court-issued 'declaration of paternity.'" The court also stated that the language of FL § 5-1028(d)(2)(i) "is clear and unambiguous that after the 60-day rescission period, 'an executed affidavit of parentage may be challenged in court *only* on the basis of fraud, duress, or material mistake of fact." (Emphasis supplied by trial court).

We agree with the trial court that the plain language of the statutes shows that the only way for appellant to set aside the finding of paternity established by his affidavit of parentage under FL § 5-1028 is fraud, duress, or material mistake of fact, and not by a blood test as requested by appellant.

Furthermore, as the Bureau points out, the legislative history behind these statutes supports our conclusion. In 1993, the General Assembly enacted the affidavit of parentage statute, in which the affidavit was "a rebuttable presumption of parentage in a paternity proceeding." 1993 Md. Laws, Ch. 197. In 1995, the General Assembly amended FL § 5-1038 to allow a putative father to challenge the declaration of paternity via genetic testing *at any time*. 1995 Md. Laws, Ch. 248. In 1997, however, the General Assembly adopted the current version of FL § 5-1028, in which it deleted the language regarding a rebuttable presumption and instead allowed the affidavit to be rescinded within sixty days,

15

or thereafter only upon a showing of fraud, duress, or material mistake of fact. 1997 Md. Laws, Ch. 609. We agree with the Bureau's analysis of the above statutory history of FL §§ 5-1028 and 5-1038:

> Significantly, the General Assembly modified FL § 5-1028, to strengthen both the effect and the finality of a paternity finding resulting from an affidavit of parentage, just two years after it had modified FL § 5-1038 to weaken the finality of a paternity judgment by allowing an adjudicated putative father to obtain a post-judgment order for genetic testing at any time. By strengthening the effect and finality of the affidavit of parentage so soon after weakening the finality of a paternity judgment, the General Assembly clearly intended not to provide individuals, such as [appellant], who have attested under oath to their parentage of children the same rights that it had just, two years earlier, provided to a putative father named in a paternity judgment. *See Taylor v. Mandel*, 402 Md. 109, 131 (2007) (courts presume that the Legislature has acted with full knowledge of prior and existing law, legislation, and policy).

Finally, appellant's reliance on *Langston* is misplaced. In *Langston*, the Court of Appeals held that an individual who had a judicial declaration of paternity entered against him could initiate proceedings to set aside the declaration, pursuant to FL § 5-1038(a)(2)(i), and request a blood or genetic test, pursuant to FL § 5-1029. 359 Md. at 437. The Court expressly stated that its "holding today applies only to proceedings to modify or set aside a paternity declaration." *Id.* Here, the paternity challenged by appellant was established by an affidavit of parentage, pursuant to FL § 5-1028, and not by a judicial determination. FL § 5-1038 can be used only to set aside a declaration of paternity, not paternity established by an affidavit of parentage under FL § 5-1028.

The trial court in the instant case also briefly addressed appellant's argument

16

regarding the alleged inequities created by the statute, namely that one can challenge an enrolled declaration of paternity at any time through a blood or genetic test, whereas one who signs an affidavit of parentage may not rescind the affidavit after sixty days, except upon a showing of fraud, duress, or material mistake of fact. Given the clear intent of the legislature, as stated above, any resolution of such inequity is reserved solely for the General Assembly.

Having established that the plain language and the legislative history of FL §§ 5-1028 and 5-1038 support the trial court's determination, we hold that the trial court did not err in ruling that appellant is not entitled to a blood or genetic test.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**

17