McDONALD, j.,
dissenting, which BARBERA, C.J., and WATTS, J., join.
Petitioner Justin Davis seeks a genetic test under Maryland Code, Family Law Article,[1] §§ 5-1029 and 5-1038, in order to determine whether he is the father of twins born to Jessica Cook in 2009. According to Mr. Davis, Ms. Cook led him to believe, at the time of the birth, that he was the biological father and he executed affidavits of parentage to that effect. It is undisputed that Ms. Cook herself never believed that they were Mr. Davis’ offspring.
The Majority opinion holds that Mr. Davis cannot get a genetic test because he is precluded by his unsuccessful attempt to avoid a finding of paternity in 2011, which was predicated on his execution of the affidavits of parentage (rather than anything to do with a paternity test). Even though the Majority opinion disposes of the case on that ground, it goes on and suggests that no one who has signed an affidavit of parentage (even if incorrectly led to believe he was the biological father of the child) can ever get a genetic test to determine paternity. I disagree with both of these conclusions. To explain that disagreement, it is helpful to elaborate *338 in somewhat greater detail the context, both factual and legal, of this case.
Background

Facts

Because this case was decided against Mr. Davis on summary judgment, we must view the facts in the light most favorable to Mr. Davis. Serio v. Baltimore County, 384 Md. 373, 388, 863 A.2d 952 (2004).
Mr. Davis and Ms. Cook began a romantic relationship around December 2008. They broke up for a short time in 2009 — Mr. Davis testified that it was three weeks — and then got back together around May 2009. When they got back together, Ms. Cook informed Mr. Davis that she was pregnant. According to Ms. Cook’s testimony, she was two months pregnant at that time, which is consistent with the fact that the children, who were twins, were born seven months later in December 2009.
At an evidentiary hearing in the Circuit Court, Ms. Cook testified about her conversations with Mr. Davis about her pregnancy. According to Ms. Cook, she told Mr. Davis that there was a possibility that he was not the children’s biological father. Later in her testimony, however, she explained that she had not explicitly told him that, but rather had simply assumed that he understood that another man was her children’s biological father. Speaking over some interruptions, in response to questions from Mr. Davis (who was appearing pro se), she testified: “If you wanted a relationship ... I had to tell you that I was pregnant. You didn’t ask me whether it was yours or not at that time. I just assume[d] that you knew that since we weren’t together and we hadn’t been together, and I was pregnant that it wouldn’t have been yours.” For his part, Mr. Davis testified that he believed that the children were his at the time that he and Ms. Cook resumed their relationship. At the summary judgment stage, we must resolve this in favor of Mr. Davis: he did not know that the children were not his, although apparently Ms. Cook did. *339 (According to Ms. Cook’s testimony, the father of her children is a man who now resides in Sweden.[2]).
Mr. Davis and Ms. Cook moved in together shortly before the birth of the children. On December 23, 2009, shortly after the twins were born, Mr. Davis and Ms. Cook were presented at the hospital with an affidavit of parentage for each baby. They signed both affidavits. Above Ms. Cook’s signature, each affidavit read, in part, “I consent to the admission of paternity and acknowledge that the man named above is the only possible father of my child.”[3] Above Mr. Davis’ signature, each affidavit read, in part, “I acknowledge that I am the natural father of the child named above.”
Sometime later, the babies’ physician pointed out to Mr. Davis the disparity in appearance between him and the children. In Mr. Davis’ words, the children are “visibly, visibly Caucasian” and Mr. Davis is not. Mr. Davis became concerned that the children were not actually his, and confronted Ms. Cook. As a result, Mr. Davis concluded that the children were not his, and their relationship ended. As noted above, Ms. Cook later confirmed, both in testimony and in filings under oath, that Mr. Davis is not the biological father of the two boys.

Procedural History

On July 25, 2011, the Wicomico County Bureau of Support Enforcement filed a Complaint for Child Support against Mr. Davis in the Circuit Court for Wicomico County.[4] The Bureau *340 rested its case entirely on the two affidavits of parentage executed by Mr. Davis at the time of the birth. Mr. Davis responded in writing and denied paternity. On September 16, 2011, the case went to trial in the Circuit Court. Mr. Davis, who was pro se in this trial,[5] denied that he was the father of the children and repeatedly asked for a genetic test to show that the children were not his.
In introducing the case to the court at the outset of the trial, counsel for the Bureau submitted the affidavits of parentage and advised the court that Mr. Davis was challenging the validity of the affidavits — ie., making a claim under § 5-1028 relating to affidavits of parentage. During the trial the Bureau’s counsel never addressed, in either argument or evidence, Mr. Davis’ request for a genetic test. The court apparently accepted the framing of the issues presented by the Bureau’s counsel and did not address Mr. Davis’ request for a genetic test, much less decide the merits of that request.[6] After testimony from Mr. Davis and Ms. Cook, the Circuit Court found that Mr. Davis had not met the statutory standard to rescind the affidavits of parentage. As a result, the Circuit Court held that Mr. Davis was the father of Ms. Cook’s children and ordered Mr. Davis to pay child support.[7] Mr. Davis did not appeal that decision.
*341 On September 10, 2013, now with the assistance of counsel, Mr. Davis filed a complaint in the Circuit Court for Wicomico County asking that the court order a genetic test as authorized by statute (§ 5-1029) and, assuming that the test confirmed that he was not the father, that the declaration of paternity and the child support order be set aside, as also provided by statute (§ 5-1038). After dealing with several motions not relevant here, the Circuit Court held a hearing on December 13, 2013, at which it received documentary evidence, took judicial notice of court records, and heard legal argument. The Circuit Court subsequently granted summary judgment against Mr. Davis on December 20, 2013. The court held that Mr. Davis was not entitled to a genetic test because: (1) Mr. Davis was attempting to challenge the affidavits of parentage, but a genetic test is not one of the ways to challenge an affidavit of parentage; (2) Mr. Davis was precluded from challenging the two affidavits due to the 2011 proceedings; and (3) Mr. Davis was precluded from pursuing his claim for a genetic test due to the 2011 proceedings.
Mr. Davis appealed to the Court of Special Appeals, which affirmed in a reported decision. 222 Md.App. 230, 112 A.3d 1024 (2015).
Discussion

A. Standard of Review

At issue before us is the Circuit Court’s award of summary judgment denying Mr. Davis’ request for a genetic test pursuant to statute. An award of summary judgment necessarily depends on the resolution of a legal issue. Accordingly, it is reviewed without deference to the lower court. Serio, 384 Md. at 388, 863 A.2d 952.
The Majority opinion correctly notes that we issued a writ of certiorari in this case to analyze the relationship between an affidavit of parentage and a request for a genetic test. Majority op. at 343, 135 A.3d at 425. Accordingly, I will discuss that issue first. Then I will explain why I believe the Majority opinion’s decision to reject Mr. Davis’ claim on the basis of *342 res judicata either misunderstands or misapplies the principles of claim preclusion.

B. Whether an Affidavit of Parentage Precludes a Genetic Test

Statutory Structure

This case involves construction of the statutes concerning genetic tests to prove or disprove paternity — and the relationship of those statutes to the statute providing for affidavits of parentage. As always, statutes must be construed in context. Lockshin v. Semsker, 412 Md. 257, 276, 987 A.2d 18 (2010) (“the plain language must be viewed within the context of the statutory scheme to which it belongs”). Accordingly, one must consider the statutory scheme in which these provisions appear.
The provision that pertains to the affidavit of parentage is located in Family Law Article, Title 5 (Children), Subtitle 10 (Paternity Proceedings), Part V (Hearing on Complaint).[8] Part V describes the procedure for determining paternity when it is contested. It begins with § 5-1024, which describes the consequences of a defendant’s failure to appear. Next, § 5-1025 requires that the trial be held after the birth of the child, and describes the procedure to follow when a complaint is filed before the birth of the child. The next two sections, §§ 5-1026 and 5-1027, set some parameters for trial of the matter: no jury is required, ordinary civil rules apply, comment on a defendant’s failure to testify is prohibited, the burden of proof is on the complainant, there is a rebuttable presumption that a man to whom the mother is married at the time of conception is the father, and a defendant may not be compelled to testify.
*343 Section 5-1028 concerning an affidavit of parentage also appears in Part V (Hearing on Complaint). It provides that “[a]n executed affidavit of parentage constitutes a legal finding of paternity,” subject to rescission by any signatory within 60 days. § 5-1028(d)(1). After 60 days, the affidavit of parentage may be challenged only on the grounds of “fraud, duress, or material mistake of fact.” § 5-1028(d)(2)(i).
The main provision for genetic tests also appears in Part V: “On the motion of the [Child Support Enforcement Administration of the Maryland Department of Human Resources], a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.” § 5-1029(b) (emphasis added). This language is mandatory: when a proper person or entity makes a proper motion, the court must order the test.
The next part of the statutory scheme — Part VI (Court Order) — describes the judicial order that follows from the proceedings in Part V. First, “[i]f the court finds that the alleged father is the father, the court shall pass an order that: (1) declares the alleged father to be the father of the child; and (2) provides for the support of the child.” § 5-1032. Subsequent provisions detail how the court shall determine who owes what to whom. See § 5-1033 (child support and other expenses); § 5-1036 (court costs); § 5-1034 (who receives payment). Other items that may be contained in the order are also detailed, and a provision describes the result of finding for the alleged father. See § 5-1035 (miscellaneous provisions in order); § 5-1039 (finding for alleged father).
It is in Part VI that a key provision, § 5-1038, appears. It provides that a declaration of paternity is final except, as pertinent here, “if a blood or genetic test done in accordance with § 5-1029 ... establishes the exclusion of the individual named as the father in the order.” § 5-1038(a)(2)(i)(2). It is notable that such a challenge to a declaration of paternity is subject to an exception: “a declaration of paternity may not be *344 modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.” § 5-1038(a)(2)(ii). This suggests that an individual who acknowledges paternity — e.g., by executing an affidavit of parentage— without knowledge that he is not the father may overturn a finding of paternity with the results of a genetic test.

The Roles of the Affidavit of Parentage and the Genetic Test

In the context of this statutory structure, the role of an affidavit of parentage becomes clear. The provision describing an affidavit of parentage as constituting a “legal finding of paternity,” § 5-1028, appears in Part V, which describes the hearing on the complaint and procedures for proving or disproving paternity. This placement indicates that an affidavit of parentage serves to preempt the usual trial process: the parties can either have a full bench trial, as described in §§ 5-1024 through 5-1027, or a party can short-circuit that process by presenting an affidavit of parentage under § 5-1028. In essence, given its location in the statutory scheme, § 5-1028 appears to be an alternative procedure to establish legal paternity. Indeed, in this case, the Bureau’s entire case consisted of submission of the affidavits of parentage executed by Ms. Cook and Mr. Davis.
Either way, once the hearing is complete, if the court finds that the alleged father is the father, then the court issues an order under the provisions in Part VI. This order includes a declaration of paternity under § 5-1032 and anything else appropriate under that Part. That is, there are two ways to reach a declaration of paternity under § 5-1032: a bench trial under the first four sections of Part V or an affidavit of parentage under § 5-1028, also in Part V. Both paths lead to the same destination: a declaration of paternity under § 5-1032.[9]
*345 In this context, the role of § 5-1038 also becomes clear: by its terms, § 5-1038 provides the grounds for modifying or setting aside a “declaration of paternity in an order” — that is, a declaration of paternity in an order under § 5-1032. Because § 5-1029, which is referenced in § 5-1038, is located in Part V (Hearing on the Complaint), and Part V describes court procedure, it must be possible to request this test during the court proceedings. Also, because § 5-1038 refers to “modifying] or set[ting] aside” an order, it must be possible to request this genetic test after the court issues the order, as this Court has held. See Langston v. Riffe, 359 Md. 396, 754 A.2d 389 (2000) (allowing a genetic test nine years after the court order).

The Relationship Between the Affidavit of Parentage and a Genetic Test

It may seem strange that the standard in § 5-1038 for setting aside a judicial order is so different from the standard in § 5-1028 for setting aside an affidavit of parentage. After all, it is possible for an alleged father to satisfy the standard in § 5-1038 — he signed the affidavit of parentage believing that he was the father, but he would like a genetic test now that doubt has arisen, and the genetic test shows that he is not the father — even if he cannot meet the standard in § 5-1028 for rescission of the affidavit — there was no fraud, duress, or material mistake of fact. The alleged father might have honestly but mistakenly believed he was the father without legally meeting the standards of fraud, duress, or material mistake of fact. Indeed, that may be this case: the alleged father’s misunderstanding may have arisen because of miscommunication, rather than intentional deception.[10]
*346 In such a situation, the affidavit of parentage is not rescinded, but the judicial order declaring paternity and requiring child support may be set aside if the genetic test excludes the alleged father. Once the order declaring paternity is set aside, the court must enter judgment for the alleged father. The alleged father is not the father, because the genetic test proved that he was not.

Legislative Purpose

Ultimately, we are seeking to carry out the legislative purpose in construing these statutes. Legislative history can shed light on the purpose of a statute, and this Court ordinarily considers the lineage of a statute when attempting to discern that purpose. See Rose v. Fox Pool Corp., 835 Md. 351, 359-60, 643 A.2d 906 (1994).
The General Assembly most recently amended § 5-1028 concerning the effect of an affidavit of parentage in 1997. See Chapter 609, Laws of Maryland 1997. As the Majority opinion explains, prior to that amendment, an affidavit of parentage established a rebuttable presumption of paternity. See Majority op. at 330, 135 A.3d at 435. The 1997 law amended the statute so that an affidavit of parentage now creates a legal finding of paternity. This was in response to the federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996, a major welfare reform bill that required states, among other things, to make certain changes to their paternity establishment procedures as a condition of the receipt of funding for Temporary Assistance for Needy Families. See Testimony of Alvin C. Collins, Secretary of Human Resources, before the Senate Judicial Proceedings Committee concerning Senate Bill 636 (1997) (February 25, 1997). The goal of the federal law was to increase the number of children supported by both parents and thereby decrease the support required from the general public. See H.R.Rep. No. 104-651 at 1326 (1996), reprinted in 1996 U.S.C.C.A.N. 2183, 2383 (“In the *347 absence of paternity establishment, taxpayers are left to pay literally billions of dollars in welfare expenses that are the obligation of delinquent parents.”). Specifically, the change that an affidavit of parentage becomes a legal finding of parentage was intended to “simplify voluntary paternity establishment” by providing a formal method of acknowledgement by the father. Id.
The Majority opinion suggests that the federal law required states to create paternity establishment procedures that would accord greater standing to an affidavit of parentage than to a judicial declaration of paternity after trial and that would preclude a finding of paternity based on such an affidavit being overturned by the results of a genetic test. Majority op. at 330-35, 135 A.3d at 435-39. In fact, the federal law supports neither proposition. Indeed, when the Uniform Law Commissioners revised the Uniform Parentage Act to incorporate the requirements of the federal welfare reform legislation, the commissioners provided that the “paternity of a child having a presumed, acknowledged, or adjudicated father” could be overturned by results of genetic testing that excluded the putative father. 9B Uniform Laws Annotated, Uniform Parentage Act (2000) § 631 (emphasis added); see also id., Comment (“This section establishes the controlling supremacy of genetic test results in the adjudication of paternity ... ”).[11]
The legislative history of the 1997 Maryland legislation reveals the concerns that resulted in the amendment of the statute concerning affidavits of parentage. First, the State legislation echoed the importance that the federal law placed parental support for children over public support. As the testimony before the Legislature indicated, the establishment of paternity in cases of unmarried mothers was not simply a *348 matter of securing monetary support for the child. The Director of Child Support Enforcement testified:
Not only does a legal parental link open the doors to benefits such as social security, gifts of inheritance, and medical coverage, but also to less quantifiable benefits such as the value to the child of knowing his or her father, an opportunity for extended family ties, and access to medical history and genetic information.
Testimony of Clifford Layman, Executive Director, before Senate Judicial Proceedings Committee concerning Senate Bill 636 (February 25, 1997) at p. 11.[12]
Because the goal of the legislation was to hold parents responsible for their own children and to establish a connection between parent and child, it seems entirely contrary to the legislative intent to hold non-parents responsible for other people’s children. See Walter v. Gunter, 367 Md. 386, 399 n. 12, 788 A.2d 609 (2002) (“Our Legislature never stated that the ‘decent support of children’ should be imposed upon those who are found, conclusively, not to be the child’s parent ... ”). Denying a paternity test to a person who signed an affidavit of parentage runs the risk of doing precisely the opposite of what the General Assembly intended.
Second, it is true that finality was another legislative concern. Changing the consequence of an affidavit of parentage from a rebuttable presumption of paternity to a legal finding of paternity increases the finality of an affidavit of parentage, but it does not suggest that finality always trumps accuracy. When a genetic test can easily prove (or disprove) paternity with a high degree of accuracy, the legislative history does not provide any reason to think that the General Assembly would prefer that a court avoid finding out the truth regarding a child’s parentage. In urging the Legislature to pass the 1997 *349 amendments, the Secretary of Human Resources noted the “linkage” of expedited paternity establishment procedures with genetic testing. Stating that genetic testing was a “key element to streamlining the paternity establishment process,” the Secretary concluded that paternity could be “essentially resolved” through such testing due to the high degree of accuracy. See Testimony of Alvin C. Collins, Secretary of Human Resources, before the Senate Judicial Proceedings Committee concerning Senate Bill 636 (1997) (February 25, 1997) at p. 9.
The bottom line is evident: an affidavit of parentage is not meant to conclusively prove that which is false. Rather, an affidavit of parentage is meant to correctly establish paternity by a formal acknowledgement so that unwed fathers provide financial, emotional, and social support to their biological children. See Pamela C. Ovwigho, Catherine E. Born, & Shafali Srivastava, Maryland’s Paternity Acknowledgment Program: Participant Entries into the Public Child Support and Welfare Systems, at 6, October 2002, available at https:// perma.cc/363W-8YUC. Thus, when an alleged father is not the biological father of the children, using an affidavit of parentage to establish paternity incorrectly over the protest of the alleged father not only unfairly saddles an individual with responsibility for children unrelated to that individual, but also deprives the children of the connection with their biological father that the affidavit of parentage was supposed to encourage and protect. Such an interpretation seems contrary to the purpose of the statute.
Hence, as the statutory text explains and the legislative history confirms, when an alleged father signs an affidavit of parentage on the basis of a genuine but incorrect belief that he is the father of the children, and he later requests a genetic test to show whether is in fact the father of the children, he is entitled to one. Then, if the test conclusively shows that he is not the father of the children, he no longer has the legal responsibilities that a father must have.

*350
The Plight of Mr. Davis

In my view, the Circuit Court erred in denying Mr. Davis a genetic test. At this stage of the proceedings, we are to regard the evidence in the light most favorable to Mr. Davis— that he signed an affidavit of parentage based on an honest but mistaken belief that he was the father of Ms. Cook’s children. The Circuit Court in 2011 properly recognized that the affidavit of parentage constituted a legal finding of paternity. However, when Mr. Davis requested a genetic test in 2011, the court should have granted that request. The court resolved the case — without ever saying explicitly that the request for a genetic test was denied — on the basis that Mr. Davis failed to produce anything that would allow him to rescind the affidavits of parentage after the 60-day window. However, that decision answered the wrong question (and the Majority opinion appears to make the same mistake).[13] Mr. Davis was not asking, under the terms of § 5-1028(d)(2)(i), to rescind the affidavits of parentage. He was asking, under the terms of § 5-1038(a)(2)(i)(2) and § 5-1029(b), for a genetic test.[14] As the preceding discussion shows, those standards are *351 entirely different; finding that Mr. Davis had not met the standard in § 5-1028 has nothing to do with whether he can meet the standards in § 5-1038.
In Langston, supra, this Court held that individuals who had previously formally acknowledged paternity in court— including in a consent decree — could later seek a genetic test pursuant to §§ 5-1029 and 5-1038. In my view, there is no basis in the statutes or their legislative history to conclude that an acknowledgement made in an affidavit of parentage executed shortly after a birth should be considered more impregnable from scientific verification than a formal acknowledgement made in court.
In particular, on these facts, the only relevant basis for denying Mr. Davis a genetic test is set forth in § 5-1038(a)(2)(ii): if the court found that Mr. Davis did in fact know that the children were not biologically his when he signed the affidavits, then the declaration of paternity may not be modified or set aside.[15] Hence, a genetic test would be *352 futile under those circumstances, and a court could properly refuse to grant one. However, the Circuit Court never analyzed this issue at all; it examined § 5-1028, not § 5-1038.

C. Whether a Genetic Test is Precluded by Res Judicata in this Case

Finally, there is the basis on which the Majority opinion actually decides this case — res judicata, also called, perhaps more precisely, “claim preclusion.”

The Standard for Claim Preclusion

Claim preclusion is “based upon the judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on issues raised, or that should have been raised.” Colandrea v. Wilde Lake Cmty. Ass’n, Inc., 361 Md. 371, 391, 761 A.2d 899 (2000). If, long after a case has completed, a party comes up with a better argument than it previously made in the case, that party does not get a do-over. Likewise, claims that were required to be joined in the original case are waived unless they are asserted at that time; a party cannot begin a new case based on claims that should have been asserted before. See Rowland v. Harrison, 320 Md. 223, 577 A.2d 51 (1990) (discussing the relationship between mandatory counterclaims and claim preclusion).
The Majority opinion quotes a rough rule of thumb for the application of claim preclusion that includes all matters that “could have been litigated in the first suit.” Majority op. at 307, 135 A.3d at 422 (quoting Prince George’s County v. Brent, 414 Md. 334, 342, 995 A.2d 672 (2010)).[16] However, the test *353 for claim preclusion is not (and has never been) whether a matter “could have been litigated in the first suit.” Otherwise, there would be no such concept as the permissive joinder of claims — a party would be compelled to join all possible claims and counterclaims (at the risk of waiving a claim that could have been joined in an earlier case). See Kent Cty. Bd. of Educ. v. Bilbrough, 309 Md. 487, 497, 525 A.2d 232 (1987) (“To make the scope of “claim” co-extensive with permissive joinder of claims in pleadings would have the same effect as a mandatory joinder for pleading purposes of all claims which the original plaintiff has against any original defendant.”). Thus, this quoted phrase is not a definitive statement of claim preclusion.
Instead, claim preclusion applies when (1) the parties in the present litigation are the same or in privity with the parties to the earlier dispute, (2) the claim presented in the current action is identical to the one determined in the prior adjudication and (3) there was a final judgment on the merits on the claim in the prior litigation. See Powell v. Breslin, 430 Md. 52, 64, 59 A.3d 531 (2013).

Claim Preclusion as to Rescission of the Affidavits of Parentage

I agree with the Majority opinion that this standard would be met to the extent that the Circuit Court construed the 2011 litigation as a contest over rescission of the affidavits of parentage on the grounds of fraud, duress, or material mistake of fact. Certainly, the parties are the same: Mr. Davis *354 and the Bureau were parties in 2011. The Circuit Court in 2011 found “that there is no fraud, duress, or mistake of material fact that would justify the rescission of the affidavits of Parentage properly executed.” Hence, given the identical parties, identical claim, and final judgment on the merits in the previous action, Mr. Davis is precluded from advancing a fraud claim that would allow him to rescind the affidavits of parentage.

Claim Preclusion as to the Request for a Genetic Test

That does not end this case, however. The core reason that claim preclusion does not apply to Mr. Davis’ request for a mandatory genetic test under § 5-1038 is that there was no final judgment on the merits of that claim.[17] The Majority describes the Circuit Court’s order in 2011 as “denying” Mr. Davis’s request for a genetic test, Majority op. at 307, 135 A.3d at 422, but the order did not say that. The court simply issued an order requiring child support based on a finding of *355 paternity. The order said nothing one way or the other about the genetic test claim, and claim preclusion does not arise out of nothing.
Nor did the Circuit Court’s oral ruling deny Mr. Davis’ claim, as the Majority argues. The Majority opinion accurately points out that Mr. Davis asked for a genetic test several times during the 2011 proceeding and contends that the Circuit Court “specifically responded to Mr. Davis’s repeated requests for a paternity test” in its oral ruling. Majority op. at 309-11, 135 A.3d at 423-25. However, the block quotation that follows that assertion in the Majority opinion only discusses whether the affidavits of parentage could be rescinded under § 5-1028. Indeed, as part of that passage, the Circuit Court explicitly says that it is addressing only the § 5-1028 issue. In particular, the Circuit Court says, “The issue in this ease is not the fatherhood of the child. The issue in this case is whether there is the presence of fraud, mistake, or duress that would justify the rescission of an Affidavit____” That is how the Bureau framed the case at the opening of the proceeding. At no point in the 2011 proceeding did the Circuit Court say anything at all about Mr. Davis’ request for a genetic test. It simply did not address that issue.[18]
This fact distinguishes Hardy v. Hardy, 2011 Ark. 82, 380 S.W.3d 354 (2011), which the Majority opinion cites as analogous to this case. In Hardy, a trial court in an earlier case had issued an order explicitly denying the father’s motion for paternity testing because it was not in the child’s best interest. See Hardy, 380 S.W.3d at 356. In those circumstances, claim *356 preclusion properly followed from the final judgment on the merits in the earlier case. Here, however, neither the oral ruling nor the subsequent order said one word about a paternity test, so the claim is not precluded.

The Effect of the Order under § 5-1032

At the conclusion of the 2011 proceeding, there was a final order declaring paternity under § 5-1032. However, § 5-1038, by its very terms, describes an exception to the rules of finality as to paternity judgments. See § 5 — 1038(a)(1) (“Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.”) (emphasis added). Because a judgment is preclusive insofar as it is final as to an issue, this exception to finality also necessarily implies an exception to preclusion: an order under § 5-1032 does not preclude assertion of a right to a genetic test under § 5-1038. If it did, then no one could ever set aside an order based on a genetic test, because the order itself would preclude the genetic test, but the statutory text and our precedents both clearly show that such an order may be set aside based on a genetic test. See Langston, supra.
A court may issue an order under § 5-1032 that is final, subject to the exceptions in § 5-1038. Such an order does not preclude a genetic test under § 5-1038, so it need not resolve any such claim before the court at that time; the claim can be reasserted later to set aside the order. When the court issued such an order regarding Mr. Davis in 2011, it left Mr. Davis’ genetic test claim hanging: the claim had neither been granted nor denied.[19]
Thus, when Mr. Davis came to court again in 2013 and asked for a genetic test to set aside the declaration of paterni *357 ty, claim preclusion did not bar his request for that test (although it did bar an attempt to rescind the affidavits of parentage). The court should have either granted Mr. Davis’s request or given a reason under § 5-1038 that Mr. Davis was not eligible for a paternity test. It was legal error to fail to do so, because, as noted above, § 5-1038 references § 5-1029, and the language in § 5-1029 requiring a test is mandatory.
Conclusion
After signing an affidavit of parentage acknowledging that he was the father of Ms. Cook’s children, which, according to Mr. Davis, he believed was true at the time, Mr. Davis learned that he might have been misled and that someone else was the children’s father. (Ms. Cook herself apparently agrees that the father is another man). Since that time, Mr. Davis has consistently maintained that he is not the father of Ms. Cook’s children and has requested a genetic test.
The Circuit Court in 2011 did not address his request for a genetic test and instead ruled on a completely different issue, so its ruling was not a final judgment on the merits of his genetic test claim. Hence, when Mr. Davis returned to court in 2013 and again requested a genetic test, he was not precluded from bringing this claim. As this Court has held in the past, genetic tests may be requested long after the judicial order that they are intended to challenge, and the statutory language provides that a court must grant a proper request for a genetic test, so there was no basis for denying Mr. Davis’s request in 2013, at least at the summary judgment stage.
Unless the Circuit Court were to find that Mr. Davis is not credible when he says that, at the time he signed the Affidavit of parentage, he did not know that Ms. Cook’s children were not his — a fact determination that is entrusted to the Circuit Court in the first instance — Mr. Davis should be granted a genetic test to determine, once and for all, whether he is the father of Ms, Cook’s children.
Chief Judge BARBERA and Judge WATTS advise that they join this opinion.

. All subsequent statutory citations are to the Family Law Article unless otherwise noted.

. The Circuit Court took judicial notice of statements by Ms. Cook in other cases in the Circuit Court concerning name change petitions in which she stated, under penalties of perjury, that Mr. Davis was not the father of the two boys.

. Ms. Cook explained the discrepancy between this statement in the affidavits of parentage — that Mr. Davis was “the only possible father” of the children — and her testimony at trial and elsewhere — that he was not their father — on the basis that she had executed those forms at a time when she was "on a lot of drugs” having just endured both a natural birth of the first twin and a Caesarean delivery of the second twin.

.In general, either the State’s Child Support Enforcement Administration, which is part of the Maryland Department of Human Resources, *340 or a local support enforcement office has responsibility for support enforcement when the obligor must make support payments to a public agency as the payee or as a collection agent for the payee. See §§ 10-106, 10 — 108(b).

. Mr. Davis’ father, who is licensed to practice law in Pennsylvania, came to court to represent Mr. Davis, but he was unable to do so because he is not licensed in Maryland.

. According to the Circuit Court, the only issue before it was whether the affidavits should be rescinded. The court concluded that the answer was "no” and held that the children "are [Mr. Davis’] children by law, and that’s the end of the story.” In "ending the story” at that point — i.e., whether the affidavits should be rescinded — it never addressed the merits of whether Mr. Davis was entitled to a genetic test.

. After making its ruling, the Circuit Court judge speculated that Mr. Davis might in fact be the biological father of the children, based on a television show the judge had seen.

. The designations of these various Parts of Subtitle 10 of Title 5 of the Family Law Article were part of statute as enacted by the General Assembly when it created the Family Law Article, see Chapter 296, Laws of Maryland 1984, and not simply a caption or catch line added by a legal publisher, see Maryland Code, General Provisions Article, § 1-208.

. The affidavit of parentage also has some significance independent of a contest over paternity and a court order. Execution of such an affidavit will result, in a case of an unmarried mother, in the individual’s name appearing on the child’s birth certificate. See Maryland Code, Health— *345 General Article, § 4-208. But this is essentially no different than the fact that the name of the husband of a married mother appears on a child's birth certificate consistent with the statutory presumption. See § 5-1027(c); Maryland Code, Estates & Trusts Article, § 1-206.

. While Mr. Davis' counsel has argued that Ms. Cook purposely misled Mr. Davis and committed fraud — presumably in an effort to satisfy the *346 “fraud” criterion for rescinding an affidavit of parentage — we need not reach that conclusion to hold that he is entitled to a genetic test.

. The Majority opinion appears to concede that the Uniform Parentage Act (2000), like the amendments to § 5-1028, was drafted to comply with the federal welfare reform legislation. Majority op. at 330-31 n. 14, 135 A.3d at 435-36 n. 14. The Majority does not explain how it came to such a different understanding from the drafters of the uniform law as to how federal law contemplates that a request for a genetic test relates to a formal acknowledgement of paternity.

. The Majority opinion includes other portions of Mr. Layman’s testimony in a footnote. See Majority op. at 334-35 n. 15, 135 A.3d at 438-39 n. 15. Those excerpts simply confirm the analysis of the statutory structure set forth in pp. 309-15, 135 A.3d at 423-27 above and says nothing about precluding genetic testing.

. Perhaps this is because the Bureau has consistently characterized Mr. Davis' position as challenging the validity of the affidavits under § 5-1028. It did so when Mr. Davis was pro se in the first proceeding in 2011, referring to Mr. Davis's claim as one to "challenge the validity of those Affidavits under [§ 5-1028],” and it has continued to do so throughout this case, including in its brief before us in which it stated that "Mr. Davis, however, seeks not to rescind a judicial paternity declaration under § 5-1038, but rather to rescind the affidavits of parentage that established his legal paternity under § 5-1028.”
This is simply mistaken. Mr. Davis never asked to rescind the affidavits in the 2011 proceeding. He said, "I’m not asking for anything else. I’m just asking for a paternity test to actually prove paternity.” Although his counsel did argue before us that there was a basis for rescinding the affidavits, his opening brief clearly continued to seek a paternity test quite independently of the validity of the affidavits — in particular, one of the headers of his opening brief was, "Sections 5-1029 and 5-1038(a)(2)(i)(2) of the Family Law Article and Langston v. Riffe Entitle Appellant to Obtain a Paternity Test.”

. At the time that Mr. Davis made his first request, during the hearing in the 2011 case, there was not yet a declaration of paternity to modify or set aside, However, § 5-1029 has no explicit time limits; a party *351 may request a genetic test during or after the proceeding. One might conclude from the respective placements of § 5-1029 and § 5-1038 that a genetic test requested during the proceeding is for use during the bench trial under §§ 5-1024 through 5-1027 and a genetic test requested after the proceeding is to set aside an order under § 5-1038, so Mr. Davis should have waited until the order issued before he requested a test. However, it seems very odd to require a litigant to sandbag a court; it seems more plausible that the General Assembly intended that one can request a genetic test that will be used under § 5-1038 even before the order has been issued. Hence, Mr. Davis could make his request when he did.
As a related point, the Circuit Court in 2013 wrote that there never was an order declaring that Mr. Davis was the father of Ms. Cook’s children. However, while the 2011 order never explicitly said that Mr. Davis was the father, it did say, “the Defendant [Mr. Davis] has a legal obligation to support the children identified in the Complaint for Child Supportf.]” The basis of this statement was the court’s prior oral ruling, "These are your children by law, and that’s the end of the story.” As a result, the Circuit Court’s written order, based on its clear oral ruling, was sufficient to constitute a declaration of paternity under § 5-1032.

. At the 2011 hearing the Bureau attempted, somewhat unsuccessfully, to establish that Mr. Davis knew that he was not the father at the *352 time he executed the affidavits, which would have rendered his request for a genetic test moot.

. The original version of this quotation was more qualified in describing this rule of thumb:
The doctrine of res judicata is that a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with *353 propriety could have been litigated in the first suit, -where the court had jurisdiction, proceedings were regular, and his omission -was due to his own negligence.
Alvey v. Alvey, 225 Md. 386, 390, 171 A.2d 92 (1961) (emphasis added). Even if this were a complete statement of the law, Mr. Davis would not be precluded on his paternity test on the ground that the paternity test "could have been litigated in the first suit” in 2011, because Mr, Davis did not omit any claims due to his own negligence (he asked for a paternity test), and arguably the proceedings here were not regular in any event, because the judge did not rule explicitly on a significant claim before the court. However, this is not a complete statement of the law. The actual legal standard differs significantly from this rough description, as outlined in the text.

. The Majority asserts that this is "an argument never raised below before [the Circuit Court] in 2013, nor before the Court of Special Appeals[.]” Majority op. at 307, 135 A.3d at 422.
However, in the complaint initiating the 2013 case, Mr. Davis alleged, "The Court did not address the repeated requests made by Mr. Davis throughout the proceeding for a blood test to prove he was not the biological father (see Family Law Article Sections 5-1029 and 5-1038) and made no decision regarding his requests.” Counsel for the Bureau understood this contention, because Bureau counsel began oral argument at the 2013 hearing by saying, "The other allegation in the Complaint is the Court didn’t address the Defendant’s request for blood test.”
Before the Court of Special Appeals, Mr. Davis argued in his opening brief, "The Circuit Court [in 2013] erred by ... relying on Judge Mitchell’s reasoning and analysis, when section 5-1038(a)(2)(i)2 was never considered and certainly never addressed by Judge Mitchell.” Before us, too, Mr. Davis stated in his opening brief, "Judge Mitchell never considered Davis's multiple requests for a paternity test, and he never made any express ruling on the issue.” He added in his reply brief, "Because that court refused to consider any fact or issue other than Davis having signed the affidavits of Parentage, there was no hearing on issues involved in the section 5 — 1038(a)(2)(i)2 claim.”
It is evident from the record that Mr. Davis has argued from the beginning of the instant case that the 2011 trial never decided the § 5-1038 claim.

. To the extent that the Majority opinion believes that the trial court’s silence concerning Mr. Davis’ request for a genetic test means that the court implicitly decided that issue when it held that there was no showing of fraud that would justify rescission of the affidavits of parentage, such a belief cannot be based on the law governing genetic tests or affidavits of parentage. There is no requirement to show fraud to obtain a genetic test under § 5-1029 and § 5-1038, so the court’s ruling on that issue did not decide the genetic test claim. And, as Langston illustrated, the fact that a paternity order is otherwise final does not disqualify one from later seeking a genetic test. Accordingly, the trial court’s ruling concerning the affidavits of parentage did not necessarily decide anything as to the request for a genetic test. The supposition that the trial court intended to do so is sheer speculation.

. In this respect, the Majority opinion misconstrues the reason that I do not think that Mr. Davis is precluded here. It is not, as the Majority opinion suggests, that I think that "genetic testing was not a specific claim in issue” in 2011. Majority op. at 310, 135 A.3d at 424. Mr. Davis certainly had asserted this claim. Rather, the Circuit Court never resolved, this issue, because it never said anything about the claim. Hence, there was never a final judgment on the merits of this claim, and claim preclusion cannot apply.