Circuit Court for Anne Arundel County
Case No. C-02-FM-15-0003308

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 465

September Term, 2016

_____

SAMANTHA BOONE

v.

JOHN YOUNGBAR

_____

Reed,
Friedman,
Moylan, Charles E., Jr.,
  (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Moylan, J.
_____

Filed: September 29, 2017

In looking at this case, we find ourselves in an improbable hall of mirrors in which the customary roles are eerily reversed. Maryland Code, Family Law Article, Sect. 5–1028 provides for an "Affidavit of parentage." The appellant, Samantha Boone, however, invokes it to ask for a declaration of non-parentage. It is frequently the unwed mother who seeks to establish the paternity of the biological father in order to ensure child support. It is the unwed mother herein, however, who seeks to disenfranchise the legally established paternity of the appellee, John Youngbar. Conversely, it is frequently the putative father who shrinks from a designation as the father. It is the unwed father herein, however, who is fighting to retain his legally established paternal status. Up is down and in is out. The topsy-turvy procedural posture of the case, however, does not begin to explain the flaws in the appellant's argument.

## The Factual Background

Albeit without benefit of clergy, the appellant and the appellee cohabitated for approximately three years. It was during that period, on September 19, 2012, that the appellant gave birth to a daughter (hereinafter "N."). At the time of N.'s conception, the appellant was, albeit briefly, engaging in a sexual relationship with someone other than the appellee. She nonetheless believed that the appellee was N.'s biological father, as did the appellee. The appellee is listed on N.'s birth certificate as biological and legal father. N., moreover, bears the appellee's last name. Pursuant to Family Law Article, Sect. 5–1028, both the appellant and the appellee executed an Affidavit of Parentage, attesting to the fact that the appellee was, indeed, N.'s biological father.

In September of 2014, however, the appellant and the appellee separated. With respect to N., they agreed to a shared custodial arrangement (one week on and one week off). That arrangement continued until October 12, 2015, when the appellant filed the "Petition to Establish Paternity" (actually a Petition to Disestablish Paternity), which is the subject matter of this appeal. In that petition, the appellant asserted that she had come to believe that the appellee was actually not N.'s biological father. Accordingly, she requested that the Circuit Court for Anne Arundel County order a DNA test to confirm the appellee's non-paternity. On January 10, 2016, the appellant filed an Amended Petition, which she properly titled a "Petition to Disestablish Paternity." In the Amended Petition, she further alleged that the appellee had, in fact, already taken a paternity test and had acknowledged that the test showed that he was not the biological father of N. The appellant further alleged that the actual biological father had also taken a paternity test that affirmatively established his paternity.

Since N.'s birth, the appellee has been deeply involved in raising her. In a case not directly involved in this appeal, he is currently litigating the issues of both custody and visitation. With respect to the appellant's Amended Petition to Disestablish Paternity, the appellee has consistently maintained that the Petition should be dismissed. Following a full hearing on February 3, 2016 on the Amended Petition and on the appellee's Motion to Dismiss, Judge Arthur M. Ahalt (as a visiting judge) granted the Motion to Dismiss. The appellant has taken this timely appeal from that dismissal.

## The Contentions

The appellant's two contentions are framed as questions. She asks:

1. Was the Circuit Court's grant of the Appellee's Motion to Dismiss the Petition to Establish Paternity correct considering the factual allegations set forth in the Appellant's Petition to Establish Paternity, Opposition to Motion to Dismiss, and Amended Petition to Disestablish Paternity?

2. Did the Trial Court err by granting the Appellee's Motion to Dismiss without taking any evidence or testimony or making a factual and legal determination under Family Law Article §5–1028 that the Affidavit of Parentage executed by the parties in this case was not obtained by either fraud, duress, or material mistake of fact?

## The Affidavit Of Parentage

This case is controlled by Maryland Code, Family Law Article, Title 5 "Children," Subtitle 10 "Paternity," Sect. 5–1028, which provides for an "Affidavit of parentage." The affidavit affords the unmarried parents of a child the opportunity to establish their legal parentage. Section (a) provides:

> (a) *In general.* — <u>An unmarried father and mother shall be provided an opportunity to execute an affidavit of parentage</u> in the manner provided under § 4–208 of the Health-General Article.

(Emphasis supplied).

Among the requirements for the filing of such an affidavit is that both the mother and the father be fully advised as to the legal significance of signing the affidavit. Subsection (c)(2) provides:

> (2) Before completing an affidavit of parentage form, <u>the unmarried mother and the father shall be advised</u> orally and in writing <u>of the legal consequences of executing the affidavit</u> and of the benefit of seeking legal counsel.

3

(Emphasis supplied). Subsection (d) alerts the signers that "**Execution constitutes legal finding of paternity.**" The appellant does not deny having been advised of both the legally determinative effect of executing the affidavit, and the benefit of retaining counsel prior to doing so.

Subsection (d) goes on to set forth the extremely limited circumstances under which the affidavit may be legally challenged.

> (1) <u>An executed affidavit of parentage constitutes a legal finding of paternity</u>, subject to <u>the right</u> of any signatory <u>to rescind the affidavit</u>:
>     (i) <u>in writing within 60 days after execution of the affidavit</u>; or
>     (ii) in a judicial proceeding relating to the child:
>         1. in which the signatory is a party; and
>         2. that occurs before the expiration of the 60-day period.

(Emphasis supplied).

Subsection (d)(2) emphasizes the severe limitation on any legal challenge.

> (2)(i) <u>After the expiration of the 60-day period, an executed affidavit of parentage may be challenged</u> in court <u>only on the basis of fraud, duress, or material mistake of fact</u>.

(Emphasis supplied).

It was shortly after the birth of N. that the appellant and the appellee executed the Affidavit of Parentage pursuant to Sect. 5–1028. That affidavit fully complied with all legal requirements. That executed Affidavit of Parentage was not rescinded or challenged in any way within the 60-day period following its execution. By the very wording of the statute, it now constitutes a "legal finding of [the appellee's] paternity" of N. The appellant challenges that legal finding.

4

**"The Road Not Taken"**

Robert Frost's "The Road Not Taken" concludes:

> Two roads diverged in a wood, and I—
> I took the one less traveled by,
> And that has made all the difference.

The anomaly of this paternity dispute's not following the stereotypical script and its disputants' not playing their stereotypical roles "has made all the difference." The road more heavily travelled, whose troubled course we have been spared, has turned out, for the moment at least, to be intractable terrain.

If, as in the more typical scenario, it were the appellee herein who, based upon genetic evidence, was attempting to repudiate his status as legal father notwithstanding his earlier affidavit of parentage, we would find the controlling law to be at the moment in a state of turbulent uncertainty. The opinion of this Court in <u>Davis v. Wicomico County Bureau of Support Enforcement</u>, 222 Md. App. 230, 112 A.3d 1024 (2015), had held that the status of paternity, once established by an affidavit of parentage, enjoys an enhanced invulnerability to subsequent challenge by the "father" not enjoyed by the more tentative status of "father" established by judicial declaration in a typical paternity case. The latter status could be attacked by genetic evidence challenging it. The former status, that established by an affidavit of parentage, could be attacked, after a period of 60 days from the signing of the affidavit, only by a showing that the original affidavit had been the result of "fraud, duress, or material mistake of fact." This Court's opinion clearly articulated this hierarchical supremacy of an affidavit of parentage over a judicial declaration of paternity.

We agree with the trial court that the plain language of the statute[] shows that the only way for appellant to set aside the finding of paternity established by his affidavit of parentage under FL § 5–1028 is fraud, duress, or material mistake of fact, and not by a blood test as requested by appellant.

222 Md. App. at 244 (emphasis supplied).

The opinion of this Court left no doubt as to its unequivocal holding.

Here, the paternity challenged by appellant was established by an affidavit of parentage, pursuant to FL § 5–1028, and not by a judicial determination. FL § 5–1038 can be used only to set aside a declaration of paternity, not paternity established by an affidavit of parentage under FL § 5–1028.

222 Md. App. at 245–46 (emphasis supplied). Certiorari, however, was granted by the Court of Appeals. It initially appeared that Davis v. Wicomico County Bureau, 447 Md. 302, 318–19, 135 A.3d 419 (2016), had affirmed the holding of this Court. Both appellate courts had, to be sure, affirmed the ruling of the trial court that the putative father, established as such by an affidavit of parentage, could no longer challenge that status. Judge Battaglia's majority/plurality opinion for the Court of Appeals based that decision, as had the earlier decision of this Court, on two separate grounds. The first ground was res judicata, an issue not here pertinent.

At the Court of Appeals level, however, there was a dissenting opinion filed by Judge McDonald and joined by Chief Judge Barbera and Judge Watts. It dissented from both grounds for decision articulated by Judge Battaglia's opinion for the Court. There was, in addition, a lone concurring opinion by Judge Adkins. The concurrence agreed with the opinion of the Court on res judicata. On that issue, therefore, Judge Battaglia's opinion, commanding four votes, is the unquestioned majority opinion of the Court.

6

The status of the Court's opinion on the second issue, however, is far more problematic. Judge Battaglia's opinion agreed with this Court that paternity established by an affidavit of parentage enjoyed an enhanced invulnerability from subsequent challenge by the "father" not enjoyed by paternity status established by a judicial declaration of paternity.

> The plain language of Sections 5–1028 and 5–1038 differs significantly. Most importantly, Section 5–1028 permits rescission of the affidavit of parentage only "on the basis of fraud, duress, or material mistake of fact." To permit Mr. Davis to pursue blood or genetic testing in the face of the self-limiting language totally eviscerates the word "only."

447 Md. at 318–19 (emphasis supplied).

Citing with approval the earlier opinion of this Court in Burden v. Burden, 179 Md. App. 348, 945 A.2d 656 (2008), Judge Battaglia's opinion reiterated that, since 1997, a paternity status established by an affidavit of parentage enjoys essential immunity from a challenge based on genetic evidence.

> The General Assembly . . . amended Section 5–1028 in 1997 to eviscerate the rebuttable presumption and replace it with the more constricting "legal finding of paternity" after the father executes an affidavit of parentage, thereby strengthening the finality of the affidavit of parentage. The basis of the latter was to comport with federal funding mandates, and most importantly, to limit the ability of a father who voluntarily acknowledged his paternity to thereafter, possibly years later, as in the instant case, obtain post-judgment blood or genetic testing.
>
> The limitations of a father's ability to challenge an affidavit of paternity only on the grounds of fraud, duress, or material mistake of fact was recognized by the Court of Special Appeals in Burden v. Burden, 179 Md. App. 348, 945 A.2d 656 (2008). Our intermediate appellate court held that the father could not disestablish paternity when his signing of the Affidavit did not involve fraud, duress, or material mistake of fact.

447 Md. at 334–35 (emphasis supplied).

7

Three members of the Court of Appeals, however, expressly dissented from that argument that paternity based on an affidavit of parentage enjoys an enhanced immunity from challenge not enjoyed by paternity based on a judicial declaration in a paternity case. Meticulously examining both the statutory context and the legislative history of the law establishing the affidavit of parentage, Judge McDonald concluded that the affidavit of parentage did not, in fact, enjoy an enhanced invulnerability to subsequent challenge.

> The bottom line is evident: an affidavit of parentage is not meant to conclusively prove that which is false. Rather, an affidavit of parentage is meant to correctly establish paternity by a formal acknowledgement so that unwed fathers provide financial, emotional, and social support to their biological children. . . . Thus, when an alleged father is not the biological father of the children, using an affidavit of parentage to establish paternity incorrectly over the protest of the alleged father not only unfairly saddles an individual with responsibility for children unrelated to that individual, but also deprives the children of the connection with their biological father that the affidavit of parentage was supposed to encourage and protect.

447 Md. at 349 (dissenting opinion by McDonald, J.) (emphasis supplied).

The affidavit of parentage, according to the dissenting opinion, was simply an alternative modality, along with the paternity test, for establishing paternity in the first instance. At that point, the resultant status of paternity was the same, regardless of the modality by which it was established.

> [A]s the statutory text explains and the legislative history confirms, when an alleged father signs an affidavit of parentage on the basis of a genuine but incorrect belief that he is the father of the children, and he later requests a genetic test to show whether is in fact the father of the children, he is entitled to one. Then, if the test conclusively shows that he is not the father of the children, he no longer has the legal responsibilities that a father must have.

Id. (emphasis supplied).

At that point, the camera of judicial interpretation zooms in on the concurring opinion of Judge Adkins as it contemplates the three-to-three deadlock looming before it. After having gone the other way on the res judicata question, Judge Adkins came down solidly in favor of Judge McDonald's dissent on the substantive issue.

> I would be joining the Dissent, in its analysis on the merits of how to interpret the relevant statutes, were this case an appeal from the 2011 judgment that Davis was not entitled to genetic testing. At that point, I would have reversed on grounds that he was so entitled. My decision would rest on the careful and thoughtful interpretation of the legislation that is delineated in the Dissent. This would surely be the equitable result.

447 Md. at 336 (concurring opinion by Adkins, J.) (emphasis supplied).

For the careful reader, of course, that concurring endorsement by Judge Adkins sublimates the dissent of Judge McDonald into the majority voice of the Court of Appeals and the controlling law of Maryland on this issue. Four votes beats three votes.

That judicial package nonetheless creates quite an obstacle course for the hasty reader, for those who approach appellate opinions without their slide rules in hand. If, arguendo, the appellee here had been challenging his status as the legal father of N., would he, notwithstanding his affidavit of parentage, have been entitled to challenge that paternal status via a genetic test? Mercifully, we are not called upon to decide. The precedential snares and pitfalls are all along the more heavily traveled route, "the road not taken" by the case before us.

On our "less traveled" road, the appellee has not challenged, questioned, or in any way sought to negate his freely accepted status of paternity. The appellant, of course, may not do for him what he has chosen not to do for himself and what, in fact, he sternly

9

opposes. His is an easy road to follow. "And that has made all the difference." Perhaps instead of mulling with Robert Frost over the possibilities of "two roads diverg[ing] in a wood," we should simply heed the more prosaic advice of Yogi Berra, "When you come to a fork in the road, take it."

In her brief and essentially cursory legal argument, the appellant does not challenge the proposition that this case is controlled by Sect. 5–1028. She argues rather that she is entitled to Sect. 5–1028(d)(2)'s exemption from the otherwise foreclosing effect of the Affidavit of Parentage because of "fraud, duress, or material mistake of fact."

## A Material Mistake Of Fact: Whose Mistake?

That argument by the appellant, however, is even more tightly focused. She makes no contention that there was fraud or duress. Her plea for exemption from the foreclosing effect of the Affidavit of Parentage is based exclusively on "material mistake of fact." The appellant contends:

> Samantha's Petition(s) and preliminary arguments by Counsel during the February 3, 2016 hearing clearly set forth a <u>factual basis on which a "material mistake" could be found</u>, and for which the Appellant could be entitled to relief. Accordingly, the Motion to Dismiss was improperly granted as a matter of law. The Appellant must be allowed to present her case to a determination on the merits of her allegations.

(Emphasis supplied).

The Affidavit of Parentage is being challenged, therefore, on the basis of a material mistake of fact. But whose mistake are we talking about? And if such a mistake had occurred (it had not), who would be entitled to benefit from it?

10

As we mentioned at the outset of the opinion, we are experiencing the destabilizing effect of a procedural hall of mirrors in which traditional roles are reversed. Subsection (d)'s reference to "fraud, duress, or material mistake of fact," as factors both recognizing, but also limiting, the exemption from the otherwise foreclosing effect of the affidavit, occurs as part of the subsection's recognition of "the right of any signatory" of the affidavit "to rescind the affidavit" freely within 60 days, but after that only on the "basis of fraud, duress, or material mistake of fact." Those are the three circumstances that would vitiate the voluntariness of a signatory's signature if that signatory had been induced to sign by one those factors.

But which signatory's right to rescission are we talking about? Fraud, duress, or material mistake of fact are not abstractions floating about in some Platonic cloud. The mere abstract existence of fraud, for instance, would be meaningless if neither signatory had been influenced by it. Any adverse impact would have to have resulted in inducing one of the signatories to sign an affidavit that that signatory would not otherwise have signed. The burden of proof, of course, is on the appellant. Subsection 5–1028(d)(2)(ii) is very precise:

> (ii) The burden of proof shall be on the challenger to show fraud, duress, or material mistake of fact.

The appellant does not suggest which of the signatories was adversely affected by a material mistake of fact or precisely what it is that that signatory would now like to rescind. The appellant can hardly rescind her maternity. There can be no mistake of fact on that score. The so-called mistake must actually have induced one of the signatories to sign the

11

affidavit, thereby permitting that signatory to disavow the affidavit even after 60 days. The appellee, to be sure, might have been led by the appellant to mistakenly believe that he was the biological father. The appellee, however, has asserted no desire to rescind anything. Is the appellant trying to rescind the appellee's acknowledgment of his paternity? Quo warranto? Only he can do that. Only a signatory may rescind. The affidavit, even if shown to be wrong, does not rescind itself.

The appellant, however, does not even speak to this issue. She simply leaves it in Limbo. The appellant's argument is, indeed, so vague and unfocused in this regard that it utterly fails to persuade us of anything. It is not our job, of course, to make for the appellant an argument she does not make for herself. This brings into play the most fundamental precept of appellate review. The presumption is that the trial judge did the right thing for the right reason and the burden is on an appellant to persuade the appellate court otherwise. The appellee does not have to prove non-error. In the present case, for instance, for us to hold that Judge Ahalt was not in error in dismissing the appellant's Petition to Disestablish Paternity, it is not necessary for us to be persuaded that Judge Ahalt did the right thing. It is only necessary that we be unpersuaded that Judge Ahalt did the wrong thing. We are so unpersuaded.

With that holding, our opinion could conveniently end at this point. In this case, however, the basic flaws in the appellant's argument so well illustrate a recurrent and generic flaw in appellate argument that they are worthy of further comment.

**The Greeks Had A Word For It**

The familiar maxim, "The Greeks had a word for it," well illustrates the source of confusion in the appellant's English-language argument in this case. Classical Greek thought could be precise because the classical Greek language was so rich in its vocabulary. A single word did not need to carry multiple meanings, as words frequently do in English. Each meaning enjoyed its own word. Meanings, therefore, never shifted invisibly in mid-analysis. It is not necessarily so in English.

The appellant here, for instance, makes a solid case for "non-paternity" (by which she initially means <u>biological</u> non-paternity), but she offers it as proof of "non-paternity" (by which she then means <u>legal</u> non-paternity). The appellant makes a solid case for "mistake" (in the sense of a <u>factual</u> mistake about biological parenthood), but she offers it as proof of "mistake" (in the very different sense of a <u>jurisdictional</u> mistake within the contemplation of Rule 5–1028(d)(2)(ii)). Such subtle shifts of meaning would not have been so subtle, or even possible, in ancient Athens. Our semantic challenge in English, therefore, is to make these invisible shifts of meaning visible. On the seas of shifting meaning, then, what elements of this case have gone adrift?

**Semantic Hurdle No. 1:**
**May "Paternity" And "Non-Paternity" Coexist?**
**Why Not?**

As happens frequently in litigation, what loom initially as seemingly intractable legal problems sometimes turn out to be simply linguistic problems. In support of her Petition and her Amended Petition to Disestablish [the appellee's] Parentage of N., the

appellant mounts a juggernaut of seemingly irrefutable proof of the appellee's non-paternity. In her brief, she summarizes her purported evidence:

> The Petition alleges in Paragraph 5 "during the time that the Plaintiff conceived the child, that is the subject of this petition, <u>she was involved in at least one other sexual relationship</u> in addition to the sexual relationship that she had with the Defendant," and in Paragraph 6 "the <u>Plaintiff believes that the Defendant is not the child's biological father.</u>" The Opposition to the Motion to Dismiss and Amended Petition further specifically allege <u>Youngbar took his own paternity test that showed he was not the biological father</u>; that the <u>Plaintiff "knows" he is not the biological father; that another individual had taken a paternity test which indicated that person was the biological father</u>; and that <u>the Defendant had previously testified under oath that the test he took indicated he was not the biological father.</u>

(Emphasis supplied).

The appellant proclaims triumphantly that this evidence proves the non-paternity of the appellee beyond any reasonable dispute, and that all that remains is for the court to place its imprimatur on that unchallengeable historic fact. But has the appellant made her case with respect to paternity or non-paternity (for the sake of linguistic convenience we will simply use the masculine term "paternity" instead of "parentage")? That all depends, of course, upon what one means by the word "paternity."

The appellant's semantic false step is in her failure to acknowledge that in this case, the word "paternity" (or the word "parentage") has at least two distinct connotations. There is, on the one hand, biological or genetic paternity. There is, quite distinctly, legal paternity. The two are not the same. The appellant declines to recognize, moreover, that she, as an advocate, should never switch connotations or meanings in mid-argument or mid-syllogism for fear of confusing the audience. With respect to the connotation of biological paternity, which is ultimately immaterial in this case, the appellant, to be sure, made a very

14

compelling argument, with which we do not take issue. What the appellant then does, in a graceful performance worthy of Fred Astaire, is to take her conclusion with respect to that biological connotation and to glide with it imperceptibly into the very different forum of the legal connotation. The appellant deftly switches meaning in mid-performance, with the audience never spotting the switch. It would be as if Astaire had launched into his routine with Ginger Rogers but had ended it with Rita Hayworth on his arm. Voila!

The biological meaning of paternity and the legal meaning of paternity, albeit in some senses obviously related, may frequently point in diametrically opposite directions, and never the twain shall meet. What the appellant was attempting to do was to disprove the appellee's legal paternity by disproving his biological paternity. But Gertrude Stein to the contrary notwithstanding, a rose is not always a rose.

A case in point is that of legal adoption. The adoptive father, in the overwhelming majority of cases, is not the biological father of the adopted child. From the day of adoption forward, however, the adoptive father is the unchallengeable legal father, impervious to claims based on blood-tests or DNA analysis. A negative example is paternal status following a legal termination of parental rights. The terminated biological father absolutely is no longer the legal father, no matter what his chromosomes may proclaim to the contrary. As fertilization clinics become increasingly available, the same legal recognition is true with regard to a legal father vis-à-vis a sperm donor. The legal father is the unchallengeable legal father and laboratory tests to the contrary are meaningless. See Sieglein v. Schmidt, 447 Md. 647, 670, 136 A.3d 751 (2016). Law trumps genetics.

15

**Semantic Hurdle No. 2:**
**When Is A Mistake Not A Mistake?**

All else failing, the appellant now tries her luck with "material mistake of fact." Semantics once again rears its head. Semantics, of course, is concerned not simply with words but with the meanings of words. Whereas the appellant obsesses over the word "mistake," our concern is with the qualifier "material." All mistakes are not the same; some are more material than others.

Chief Judge Robert Murphy dealt in depth with the relative grading or categorizing of mistakes in <u>Tandra S. v. Tyrone W.</u>, 336 Md. 303, 648 A.2d 439 (1994). In that consolidated case, two putative fathers had been judicially declared to be the fathers in separate paternity proceedings. In one case two and one-half years later and in the other case six years later, the two men challenged the earlier judicial declarations of paternity. They did so on the basis of laboratory tests that had subsequently shown with scientific certainty that the men were not the biological fathers and that the judicial declarations to the contrary, therefore, had been, in some sense, mistaken.

In his motion to have the judicial declaration of his paternity set aside, one of the appellees, Tyrone, "contended that there was indeed a mistake in the case, <u>i.e.</u>, he was mistakenly named the father of the child." Subsequent court-ordered blood tests, indeed, excluded Tyrone as a potential biological father. 336 Md. at 307. The "mistake" relied upon there is indistinguishable from the "mistake" relied upon by the appellant here to exempt her from the 60-day filing deadline.

The procedural tollgate in <u>Tandra S. v. Tyrone W.</u> was Maryland Rule 2–535. "[P]aternity judgments are governed by the strict revisory rules set forth in Rule 2–535." 336 Md. at 315. An exemption from the otherwise foreclosing effect of Rule 2–535 is made available only in the case of "fraud, mistake, and irregularity." That tollgate is only modestly different from our tollgate in this case, Sect. 5–1028(d)(2) which permits post-60 day challenges "only on the basis of fraud, duress, or material mistake of fact." Considering the similarity in basic purpose between the two rules and considering the similarity of impact on findings of paternity, we are firmly persuaded that what Judge Murphy told us about "mistake" pursuant to Rule 2–535 applies with equal cogency to "material mistake of fact" pursuant to Sect. 5–1028(d)(2). Judge Murphy looked initially at procedural gate-keeping generally and at our appropriate restraint when permitting exemptions.

> The terms fraud, mistake, and irregularity, as used in Rule 2–535 and its predecessor, Rule 625a, have been thoroughly defined by our cases. It is evident from these decisions that <u>those terms are to be narrowly defined and strictly applied</u>.

336 Md. at 315 (emphasis supplied).

The big distinction that Judge Murphy drew was that between a mistake which simply affects the outcome of the case before the court on its merits and a "jurisdictional mistake" which affects the very jurisdiction of the court to hear the case in the first instance.

> It is well settled that <u>"mistake" as used in Rule 2–535(b) is limited to a jurisdictional error, i.e. where the court has no power to enter the judgment.</u>

336 Md. at 317 (emphasis supplied).

Lesser mistakes which are "not jurisdictional in nature" do not permit a court "to exercise its revisory power."

> In <u>Hughes v. Beltway Homes, Inc.</u>, . . . we cited numerous examples of <u>mistakes, not jurisdictional in nature, which would not permit a court to exercise its revisory power</u>[.]
>
> . . . .
>
> From this catalogue of examples, it is clear that <u>the term "mistake," as used in Rule 2–535(b), does not mean a unilateral error of judgment</u> on the part of one of the parties. Rather, as we have previously stated, <u>mistakes justifying a revision under the Rule are confined to jurisdictional mistakes</u>.

336 Md. at 317–18 (emphasis supplied).

In one of the two cases before the Court, the Court of Special Appeals had earlier held in favor of the petitioner who was trying to have the declaration of paternity revised (negated). This Court held that in light of the irrefutable scientific evidence that he was not the father, a failure to recognize that fact would be palpably unfair. We determined that the "limitations on the court's revisory power . . . [were] impractical in light of the specific circumstances" of the case. In reviewing this Court's decision, the Court of Appeals responded "We disagree. A harsh result or an unfair decision is not equivalent to impracticality." 336 Md. at 315.

In this case, the initial belief of both the appellant and the appellee that the appellee was the biological father of N. was a mistake of fact. Was it, however, a <u>material</u> mistake of the dimension that permits an exemption from the rules of repose that protect enrolled judgments from revision for less than overwhelming reasons? <u>Tandra S. v. Tyrone W.</u> very clearly said no.

> Tyrone appears to argue that the circuit court properly vacated the original paternity judgment because both fraud and mistake occurred. First, <u>he contends that the blood test excluded him and thus he was "mistakenly" adjudicated to be T.W.'s father</u>.

18

. . . .

> As detailed above, <u>an enrolled judgment will only be vacated for mistake if the mistake is jurisdictional</u>. In this case, Tyrone never alleged a jurisdictional mistake; rather, <u>the only mistake he points to is the mistake which declared him to be the father</u>.

336 Md. at 318–19 (emphasis supplied).

The precise same type or category of mistake that the appellant relies on in this case was held not to be a jurisdictional mistake.

> [I]n the instant case, <u>the fact that the parties later learned that Tyrone was not the father of the child was not a jurisdictional mistake</u>; consequently, <u>the circuit court was without authority to set aside the enrolled paternity judgment on the basis of mistake</u>.

336 Md. at 319 (emphasis supplied).[1]

---

[1] In dealing with the first of the three circumstances that might permit an easing of the rule foreclosing late challenges, to wit, "fraud," the Court of Appeals's analysis closely paralleled its analysis in the case of "material mistake." The distinction was made between "intrinsic fraud," which may produce mistakes interior to the trial itself, and "extrinsic fraud," which looks not to the result of the trial but to the very opportunity for the trial to take place. Extrinsic fraud will permit late revision. Intrinsic fraud will not.

In this case, of course, fraud was not even alleged. The handling by the Court of Appeals of the distinction between extrinsic fraud and intrinsic fraud nonetheless throws light on the Court's distinction between a "material mistake of fact" and a non-material mistake of fact. 336 Md. at 315–17. <u>See also Hamilos v. Hamilos</u>, 297 Md. 99, 105, 465 A.2d 445 (1983); <u>Schwartz v. Merchants Mortgage Co.</u>, 272 Md. 305, 309, 322 A.2d 544 (1974); <u>Hresko v. Hresko</u>, 83 Md. App. 228, 232, 574 A.2d 24 (1990) ("Fraud is extrinsic when it actually prevents an adversarial trial. . . . In determining whether or not extrinsic fraud exists, the question is not whether the fraud operated to cause the trier of fact to reach an unjust conclusion, but whether the fraud prevented the actual dispute from being submitted to the fact finder at all.")

19

## A Need For Semantic Precision

Paternity? Mistake? There is a pressing need for semantic precision in appellate advocacy. Although a surface reading of the unadorned words could no doubt have produced a diametrically different result, we have been reviewing a case where overwhelming evidence of non-paternity did not prove non-paternity and where convincing evidence of a mistake did not establish a mistake. Words alone can be treacherously ambiguous. It is meaning that matters.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**