*Faison v. MCOCSE*
No. 1486, September Term 2016
Opinion by Nazarian, J.

**HEADNOTES**

MARYLAND FAMILY LAW ARTICLE SECTIONS 5-1028, 5-1032, 5-1038

A father is entitled to a blood or genetic test on request for the purpose of setting aside a § 5-1032 judicial declaration of paternity or attempting to rescind an affidavit of parentage under § 5-1028.

MARYLAND FAMILY LAW ARTICLE SECTIONS 5-1028, 5-1038

An order pursuant to § 5-1032 does not preclude an assertion of a right to a genetic test under 5-1038.

PATERNITY – AFFIDAVIT OF PARENTAGE – MISTAKE OF MATERIAL FACT

An alleged father may request a blood or genetic test to establish a material mistake of fact in an effort to rescind an affidavit of parentage.

Circuit Court for Montgomery County
Case No. 134567-FL

REPORTED

IN THE COURT OF SPECIAL APPEALS

 OF MARYLAND

No. 1486

September Term, 2016

_____

REGINALD FAISON, JR.

v.

MCOCSE, *ex rel* KASANDRA MURRAY

_____

Nazarian,
Beachley,
Zarnoch, Robert A.
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  December 4, 2017

Although it was hardly Reginald Faison, Jr.'s plan, his appeal in this case reprises *Davis v. Wicomico Cty. Bureau*, 447 Md. 302 (2016), without the intervening *res judicata* question. Throughout KaSandra Murray's ("Mother") pregnancy, Mr. Faison believed he was the father of her child. The day after the baby girl ("Child") was born, both Mother and Mr. Faison signed an affidavit of parentage attesting that Mother was Child's mother and Mr. Faison was her father. In the months that followed, Mr. Faison and his family maintained a relationship with Child. But he came over time to suspect he wasn't Child's father after all, the relationship ceased, and these child support proceedings ensued.

In response to the Montgomery County Office of Child Support Enforcement's ("MCOCSE" or the "Office") complaint against him, Mr. Faison denied formally that he was Child's father, and requested a blood test to determine paternity. The Circuit Court for Montgomery County denied his request, finding the affidavit had created a presumption of parentage and that he had not borne his burden of proving that he signed it as a result of fraud, duress, or a material mistake of fact.[1] He appeals on two grounds: *first*, that the circuit court erred when it denied his Motion for Genetic Testing, and *second*, that the circuit court erred by failing to consider whether he met his burden of proving a material mistake of fact. We agree with his first contention and reverse so that he can pursue the second on remand.

---

[1] The court also ordered him to pay child support, a decision not before us in this appeal.

# I.    BACKGROUND

Mother and Mr. Faison met at Salisbury University. They first had sexual relations in mid- to late July 2014, returned to college in August, and began dating exclusively in late September. On January 14, 2015, Mother texted Mr. Faison and told him she was at least three months pregnant and that he was the father. He believed he was the father after calculating three months from January and determining that the baby was conceived in late September, when they last had unprotected sex. He later testified that learning the baby was due in mid-June 2015 gave him "more reason . . . to believe that [Child] was [his]."

As it turned out, Child was born a month earlier, on May 15, 2015. Even so, Mother and Mr. Faison signed an Affidavit of Parentage (the "Affidavit") the day after Child was born. The top of the Affidavit stated that "**This Affidavit is a legal document and constitutes a legal finding of paternity."** (Boldface type in original.) And above the space for his signature, Father acknowledged paternity, under penalties of perjury:

> *I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true* to the best of my knowledge, information, and belief. *I am the natural father of the child named in Part I of this affidavit.*

(Emphasis added.) Mr. Faison also was listed as the father on Child's birth certificate.

Mr. Faison testified that when he signed the Affidavit, he believed he was Child's biological father, and he would never have signed it had he known the actual conception date, which he came later to believe occurred sometime in August, not late September. He

testified that two at-home DNA tests excluded him as the father.[2] Although Mr. Faison and his family developed and maintained a relationship with Child from the time she was born until early December 2015, all communication and contact with Mother and Child ceased after that point.

The Office filed a form complaint against Mr. Faison for child support that relied on the Affidavit to establish parentage. Mr. Faison answered the Complaint and denied that he is Child's father. In addition to the relative timing of their last relations and Child's birth, Mr. Faison attached copies of Mother's separate petition to change Child's name from his to hers,[3] as well as the results from the at-home DNA tests.[4] Along with his answer, Father also filed a Motion for Genetic Testing (the "Motion") that the Office opposed.

The circuit court held a hearing on the Motion on August 19, 2016. After taking testimony from Mr. Faison, his mother, and Mother, the court found that Mr. Faison had

[2] Counsel for the Office objected to Mr. Faison's reference to the DNA results on the grounds that the at-home tests were not court-approved, but the court permitted the testimony on the condition that it was admissible "for the purpose of the process and not for the truth of the matter asserted."

[3] In her Petition for Change of Name, Mother wrote that "Reginald Faison Jr. is not the father." She contended at the hearing that she did this only in response to a letter from Mr. Faison's counsel threatening liability for his attorney's fees if she didn't. When asked on redirect whether she believed it would be in Child's best interest to have contact with her biological father, Mother testified that Mr. Faison *is* Child's biological father. Mother then stated that Child "knows [Mr. Faison] as her father."

[4] The DNA Test Report that Mr. Faison submitted notes that the results "may not be defensible in a court of law for the establishment of paternity . . ." because the samples were not collected under a strict chain of custody by a third neutral party.

signed the Affidavit and that his signature was not the a result of fraud or misrepresentation,

and denied his Motion:

> I make the following findings. The child in this case was born in May 2015. There has been lots of testimony here today about [Mother]'s contact with [Mr. Faison]. So [Mother]'s contact with Mr. Faison and also her contact with another gentleman whose last name is Marshall.
>
> The testimony establishes that from the time [Mother] announced that she was pregnant and that she believed Mr. Faison to be the father Mr. Faison and his family participated with the child—well, not the child yet—with [Mother] in an attempt to get to know her and her family and that there were no questions about whether Mr. Faison was the child's father.
>
> * * *
>
> I don't know and I don't think anybody in the courtroom knows exactly when this child was conceived given that the plaintiff and the defendant were involved in a romantic relationship which included sexual relations. I also have evidence from the defendant that when he was presented with the affidavit of parentage at the hospital he signed it. The plaintiff stated that she asked him whether he was sure about this. He says that didn't happen. Either way he signed it.
>
> As we discussed at some length, the affidavit of parentage itself has a series of instructions at the top of the page which are clear about what you should do if you have any questions or there is any possibility that you think you might not be this child's father. And then we get to the fall of 2015 when the paternal grandparents decided that they would have the child tested.
>
> So they got a home kit and they did a test. And then they got another home kit and they did another test and both times the test indicated that Mr. Faison wasn't the child's father. While what I am about to say probably sounds like a ridiculous legal hurdle because of the way the law works and should work with regard to children and parents, and because there needs to be

4

some control over testing gets done, and by whom the court system contracts with an entity to do the testing.

We don't do testing when someone has already acknowledged parentage. This alas until about 30 years ago was the method by which we identified who is a parent was that the woman was pregnant and a man who had been with her took responsibility or sometimes didn't and once in a while there had to be a proceeding, a trial, but often what happened is the woman was left in a situation where she had a baby that couldn't be identified—whose father couldn't be identified. We don't do it that way anymore but we haven't quite gotten to the place where we test every child at birth.

So do we test them in the hospital waiting room and whoever is there gets tested and it turns out that person is not the father we go from there[?] I hope we never get there but we might have to because of this kind of situation. It is clear that sometime during the year of 2014 up until sometime in the summer [Mother] had relations with another man, Mr. Marshall, who also goes by BJ. I do not have the evidence today to say that Mr. Faison's acknowledgment of parentage of [Child] was the result of fraud or misrepresentation.

And because this is the case, I cannot order the testing that he would like me to order so that he could prove or not that he is not the child's father. So that's the legal answer. And now the practical answer which is that it is clear to me from the evidence that I had that your family embraced this child and then has not had any contact with her because of a testing process that was done outside the legal framework and decisions that were made about what that testing meant.

After a second hearing on child support, Mr. Faison filed a timely notice of appeal.

We will discuss additional facts as necessary below.

## II.    DISCUSSION

Mr. Faison raises two issues on appeal.[5] *First*, he argues that he was entitled under *Davis v. Wicomico Cty. Bureau*, 447 Md. 302 (2016), to an order for genetic testing and that the circuit court erred in denying it. *Second*, he argues that the circuit court erred by failing to address whether he met his burden of proof of mistake of a material fact. We review the court's legal decisions *de novo*, *Walter v. Gunter*, 367 Md. 386, 392 (2002), and review for abuse of discretion the court's application of the law to the facts, since trial courts are "in the best position to assess the import of the particular facts of the case and to observe the demeanor and credibility of witnesses." *Beckman v. Boggs*, 337 Md. 688, 703 (1995) (citing *Petrini v. Petrini*, 336 Md. 453, 470 (1994)).

### A.    Mr. Faison Is Entitled To Genetic Testing.

*First*, Mr. Faison argues that the court erred when it denied his motion for an order authorizing genetic testing, and that he was entitled to a test for the purpose of proving that

---

[5] Father phrased the issues as follows in his brief:

> 1.   DID THE TRIAL COURT ERR IN DENYING FAISON'S MOTION FOR GENETIC TESTING WHEN THE STATUTE MAKES SUCH TESTING MANDATORY UPON REQUEST OF A PARTY?
> 2.   DID THE TRIAL COURT ERR BY DENYING FAISON'S MOTION FOR TESTING WITHOUT CONSIDERING WHETHER FAISON HAD SIGNED THE AFFIDAVIT OF PARENTAGE AS A RESULT OF A MATERIAL MISTAKE OF FACT?

6

he signed the Affidavit under the materially mistaken belief that he was Child's biological father. The Office counters that he was not entitled to a genetic test because he acknowledged parentage when he executed the Affidavit, and that he failed to prove that he signed as a result of fraud, duress, or material mistake of fact. We agree with Mr. Faison that the governing statutory law, as interpreted by a majority of the judges of the Court of Appeals in *Davis*, 447 Md. at 302, entitles him to genetic testing for the purpose of pursuing claims that he signed the Affidavit as a result of a material mistake of fact and the resulting declaration of paternity should be set aside.

The governing statutes are contained in Subtitle 10 of Title 5 of the Family Law Article ("FL"), titled "Paternity Proceedings." An executed affidavit of parentage constitutes a legal finding of paternity. FL § 5-1028(d)(1). An affiant may rescind the affidavit within sixty days after execution. *See id.*, § 5-1028(d)(1)(i) – (ii). After that, "an executed affidavit of parentage may be challenged in court only on the basis of fraud, duress, or material mistake of fact." *Id.*, § 5-1028(d)(2)(i). Everyone agrees, and the court found, that neither Mother nor Mr. Faison rescinded the Affidavit within sixty days of its execution. So, as the trial court explained, the Affidavit established Mr. Faison's paternity pursuant to § 5-1028, and Mr. Faison had the burden to show fraud, duress, or a mistake of material fact if he wanted to rescind the Affidavit. *Id.*, § 5-1028(d)(2)(ii). In addition, a parent can seek to set aside the declaration of paternity "if a blood or genetic test done in accordance with § 5-1029 of this subtitle establishes the exclusion of the individual named as the father in the order." *Id.*, § 5-1038(a)(2).

7

Mr. Faison's Answer disputed that he is Child's father, and his Motion sought to satisfy his burden of proving that he was mistaken in believing at the time he signed the Affidavit that he was Child's biological father. His answer didn't allege that Mother committed fraud, but that Mother later "informed him that he is not the father of the minor child" and that at-home DNA tests confirmed this.

The question of an affiant parent's right under the Family Law Article to genetic testing for this purpose, and on this posture, came before the Court of Appeals in *Davis*, 447 Md. at 302. But although all of the opinions in *Davis* addressed this statutory question, the case was resolved on *res judicata* grounds not present here, and the 3–1–3 vote to affirm the underlying judgment veiled a four-vote majority interpreting the statute to entitle a putative father, post-affidavit execution, to obtain a genetic test. On its posture, the *Davis* concurrence-plus-dissent's statutory analysis qualifies officially as *dicta*. *Dicta* or not, we agree that the *Davis* dissent has analyzed the statute correctly, and we will follow its analysis here. *Accord Boone v. Youngbar*, No. 465, September Term 2016 (issued Sept. 29, 2017), slip op. at 5–10 (adopting *Davis*'s concurrence-plus-dissent's statutory analysis of the relevant FL sections as "the controlling law of Maryland on this issue").

In *Davis*, the Wicomico County Bureau of Support Enforcement ("Bureau") filed a Complaint for Child Support alleging that Mr. Davis was responsible for supporting twin boys. Like Mr. Faison, Mr. Davis had executed affidavits of parentage when the boys were born. Appearing *pro se*, Mr. Davis requested a paternity test and denied parentage of the children, alleging that his signatures on the affidavits had been obtained through fraud or

8

misrepresentation. The trial judge disagreed, denied Mr. Davis's request for a paternity test, and ordered him to pay child support. The trial court based its decision on the affidavit of parentage and the lack of evidence showing fraud, duress, or mistake of material fact. Mr. Davis did not appeal that decision. *Davis*, 447 Md. at 304–05.

Two years later, with the assistance of counsel, Mr. Davis filed a second complaint requesting a genetic test under FL § 5-1029 and, assuming that the test confirmed that he was *not* the father, asking the court to set aside the declaration of paternity and order of child support under FL § 5-1038. The circuit court granted summary judgment in the Bureau's favor, holding that Mr. Davis was not entitled to a genetic test because the statute did not permit genetic testing for the purpose of challenging an affidavit of parentage, and that he was precluded by *res judicata* from challenging the affidavits or pursuing his claim for a genetic test. Mr. Davis appealed to this Court, and we affirmed. We concluded that Mr. Davis's claims were barred by *res judicata*, and we found no error on the trial court's part. 222 Md. App. 230 (2015). The Court of Appeals granted Mr. Davis's petition for a writ of *certiorari*. *Davis v. Wicomico Cty. Bureau*, 444 Md. 638 (2015).

The Court of Appeals ultimately affirmed the judgment. A three-judge plurality agreed with our conclusions that *res judicata* barred Mr. Davis's claims, and that in any event, a person who has signed an affidavit of parentage does not have an automatic right to blood or genetic testing pursuant to FL § 5-1028. A fourth judge concurred with the plurality's finding that *res judicata* barred the appeal, and thus formed the majority to affirm. The concurring judge added, however, that but for the *res judicata* problem, she

9

would have joined the dissent's "careful and thoughtful interpretation" of the statutes and held that Mr. Davis was entitled to a genetic test, because it "would surely be the equitable result." *Davis*, 447 Md. at 336 (Adkins, J., concurring). A three-judge dissent then analyzed the governing statutes, and concluded, both from the language and structure of the statute and in light of the legislative history, that Mr. Davis was entitled to a genetic test:

> This case involves construction of the statutes concerning genetic tests to prove or disprove paternity—and the relationship of those statutes to the statute providing for affidavits of parentage. As always, statutes must be construed in context. *Lockshin v. Semsker*, 412 Md. 257, 276, 987 A.2d 18 (2010) ("the plain language must be viewed within the context of the statutory scheme to which it belongs"). Accordingly, one must consider the statutory scheme in which these provisions appear.
>
> The provision that pertains to the affidavit of parentage is located in Family Law Article, Title 5 (Children), Subtitle 10 (Paternity Proceedings), Part V (Hearing on Complaint).
>
> ***
>
> The main provision for genetic tests also appears in Part V: "On the motion of the [Child Support Enforcement Administration of the Maryland Department of Human Resources], a party to the proceeding, or on its own motion, the court *shall order* the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child." § 5-1029(b) (emphasis added). This language is mandatory: when a proper person or entity makes a proper motion, the court *must* order the test.
>
> It is in Part VI that a key provision, § 5-1038, appears. It provides that a declaration of paternity is final except, as pertinent here, "if a blood or genetic test done in accordance with § 5-1029 ... establishes the exclusion of the individual named as the father in the order." § 5-1038(a)(2)(i)(2). It is

10

notable that such a challenge to a declaration of paternity is subject to an exception: "a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father." § 5- 1038(a)(2)(ii). This suggests that an individual who acknowledges paternity—*e.g.*, by executing an affidavit of parentage—*without knowledge* that he is not the father may overturn a finding of paternity with the results of a genetic test.

In the context of this statutory structure, the role of an affidavit of parentage becomes clear. The provision describing an affidavit of parentage as constituting a "legal finding of paternity," § 5-1028, appears in Part V, which describes the hearing on the complaint and procedures for proving or disproving paternity. This placement indicates that an affidavit of parentage serves to preempt the usual trial process: the parties can either have a full bench trial, as described in §§ 5- 1024 through 5-1027, or a party can short-circuit that process by presenting an affidavit of parentage under § 5- 1028. In essence, given its location in the statutory scheme, § 5-1028 appears to be an alternative procedure to establish legal paternity. Indeed, in this case, the Bureau's entire case consisted of submission of the affidavits of parentage executed by Ms. Cook and Mr. Davis.

Either way, once the hearing is complete, if the court finds that the alleged father is the father, then the court issues an order under the provisions in Part VI. This order includes a declaration of paternity under § 5-1032 and anything else appropriate under that Part. That is, there are two ways to reach a declaration of paternity under § 5-1032: a bench trial under the first four sections of Part V or an affidavit of parentage under § 5-1028, also in Part V. Both paths lead to the same destination: a declaration of paternity under § 5-1032.

In this context, the role of § 5-1038 also becomes clear: by its terms, § 5-1038 provides the grounds for modifying or setting aside a "declaration of paternity in an order"—that is, a declaration of paternity in an order under § 5-1032. Because § 5-1029, which is referenced in § 5-1038, is located in Part V (Hearing on the Complaint), and Part V describes

11

court procedure, it must be possible to request this test during the court proceedings. Also, because § 5-1038 refers to "modif[ying] or set[ting] aside" an order, it must be possible to request this genetic test after the court issues the order, as this Court has held. *See Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000) (allowing a genetic test nine years after the court order).

It may seem strange that the standard in § 5-1038 for setting aside a judicial order is so different from the standard in § 5-1028 for setting aside an affidavit of parentage. After all, it is possible for an alleged father to satisfy the standard in § 5-1038—he signed the affidavit of parentage believing that he was the father, but he would like a genetic test now that doubt has arisen, and the genetic test shows that he is not the father—even if he cannot meet the standard in § 5-1028 for rescission of the affidavit—there was no fraud, duress, or material mistake of fact. The alleged father might have honestly but mistakenly believed he was the father without legally meeting the standards of fraud, duress, or material mistake of fact. Indeed, that may be this case: the alleged father's misunderstanding may have arisen because of miscommunication, rather than intentional deception.

\*\*\*

Because the goal of the legislation was to hold parents responsible for their own children and to establish a connection between parent and child, it seems entirely contrary to the legislative intent to hold *non-parents* responsible for *other people's* children. *See Walter v. Gunter*, 367 Md. 386, 399 n.12, 788 A.2d 609 (2002) ("Our Legislature never stated that the 'decent support of children' should be imposed upon those who are found, conclusively, not to be the child's parent ..."). Denying a paternity test to a person who signed an affidavit of parentage runs the risk of doing precisely the opposite of what the General Assembly intended.

\*\*\*

The bottom line is evident: an affidavit of parentage is not meant to conclusively prove that which is false. Rather, an affidavit of parentage is meant to correctly establish paternity

by a formal acknowledgement so that unwed fathers provide financial, emotional, and social support to their biological children. *See* Pamela C. Ovwigho, Catherine E. Born, & Shafali Srivastava, *Maryland's Paternity Acknowledgment Program: Participant Entries into the Public Child Support and Welfare Systems*, at 6, October 2002, available at https://perma.cc/363W–8YUC. Thus, when an alleged father is not the biological father of the children, using an affidavit of parentage to establish paternity incorrectly over the protest of the alleged father not only unfairly saddles an individual with responsibility for children unrelated to that individual, but also deprives the children of the connection with their biological father that the affidavit of parentage was supposed to encourage and protect. Such an interpretation seems contrary to the purpose of the statute.

Hence, as the statutory text explains and the legislative history confirms, *when an alleged father signs an affidavit of parentage on the basis of a genuine but incorrect belief that he is the father of the children, and he later requests a genetic test to show whether is in fact the father of the children, he is entitled to one*. Then, if the test conclusively shows that he is not the father of the children, he no longer has the legal responsibilities that a father must have.

*Davis*, 447 Md. at 342–49 (McDonald, J., dissenting) (emphasis added).

This case presents the identical issue without the *res judicata* wrinkle or the analytical inversion in *Boone*.[6] Unlike Mr. Davis, Mr. Faison appealed the trial court's

---

[6] In *Boone*, the mother sought genetic testing for the purpose of disproving the affidavit-acknowledged paternity of the father, with whom she was litigating custody and visitation. We affirmed the circuit court's dismissal of the mother's petition to disestablish paternity, holding that FL § 5-1028(d) did not authorize *her* to seek genetic testing for the purpose of seeking to prove that the *father* had signed the affidavit under a material mistake of fact. *Id.*, slip op. at 10–12. Put another way, the statute authorized testing to attempt to prove one's own mistake, not the mistake of another.

13

decision denying his motion for genetic testing. Unlike Ms. Boone, Mother is not attempting to prove that someone else made a material mistake of fact—Mr. Faison is trying to prove that he signed the Affidavit based on the mistaken belief that he was Child's father. The Affidavit begat a finding that Mr. Faison is the Child's father, and that finding remains in place until disproven. But as the *Davis* dissent explicated, that finding isn't immutable—the statute contemplates that a parent might sign an affidavit against a genuinely mistaken belief of his parentage, and it allows Mr. Faison the opportunity to try and establish that mistake in an appropriate (and likely conclusive either way) manner, and have the Affidavit rescinded under § 5-1028 or the declaration of paternity set aside under § 5-1038. This is precisely the situation that the *Davis* dissent anticipated, where the father may or may not be able to prove that he signed the affidavit as a result of fraud, duress, or material mistake of fact, but may have had a good faith belief that he was the father that testing can now resolve. *Davis*, 447 Md. at 345–46 (McDonald, J., dissenting) ("In such a situation, the affidavit of parentage is not rescinded, but the judicial order declaring paternity and requiring child support may be set aside if the genetic test excludes the alleged father.").

The trial court recognized properly that the signed Affidavit constituted a legal finding of paternity. But when Mr. Faison requested a genetic test, the court should have granted that request. Without the opportunity for a genetic test, the provisions of the Family Law Article would place Mr. Faison in a complicated catch-22: he would be entitled to rescind the Affidavit if he can prove fraud, duress, or material mistake of fact, or to attempt

14

to exclude himself as Child's father, but would have no way to obtain the one form of testing most likely to answer these questions. The Legislature did not intend to hold non-parents responsible for other people's children, *Davis*, 447 Md. at 348 (McDonald, J., dissenting), nor to encourage a court to avoid finding out the truth about a child's parentage. So "when an alleged father signs an affidavit of parentage on the basis of a genuine but incorrect belief that he is the father of [a child], and he later requests a genetic test to show whether [he] is in fact the father of [the child], he is entitled to one." *Davis*, 447 Md. at 349 (McDonald, J., dissenting).

For the same reason, the circuit court erred when it required Mr. Faison first to satisfy a best interest of the child analysis as a prerequisite to a genetic test:

> [I]t's probably useful for me to try to articulate what I think I'm doing here this morning -- because I think it's a fairly narrow process. I am trying to determine whether it is in the child's best interest or not to override the presumption that is created by the signature of this document which says at the top, this is a legal document and constitutes a legal finding of paternity, the presumption that he is this child's father. What I have to hear in order to override that presumption is what, if any, evidence there is that would lead me to the conclusion that it's in the child's best interest to do this testing. And ordinarily, what that requires is some articulation of how it's beneficial to the child.
>
> Typically people tell me that it would be beneficial for the child to know who the child's parents are, that's fine, as long as there is somebody who is the alleged other parent. And typically then what I do is allow testing for the gentleman generally who is alleged to be the parent, the father, and if that produces a positive genetic test, we proceed from there. I don't generally get the evidence that's required to make a determination about the best interest of the child in a situation where there is no

15

> other nominee, let's say, for parent of the child. So maybe to say it the other way, from my perspective having done a lot of these cases, it is not in the child's best interest generally to remove one of the parents without there being some other explanation.
>
> ***
>
> The law says he's the father, and so it becomes his job to explain why it's in the child's best interest to have a parent removed from the child's life.

The child's best interests play no role in the statutory question of whether a declaration of paternity may be set aside. The question is whether Mr. Faison can establish that he signed the affidavit of parentage subject to a mistake of material fact, FL § 5-1028(d)(2), or whether he's entitled to set the declaration of parentage aside, § 5-1038(a)(2), either of which will depend on whether the blood or genetic test excludes him as the father. FL § 5-1030(2)(i)(2); *see also Langston v. Riffe*, 359 Md. 396, 428, 435 (2000) ("[A]n examination of the best interests of the child has no place" in a court's determination to grant a putative father's request for a genetic test).

Whether Mr. Faison can, after testing, meet his burden of proof remains to be seen, and we express no views on whether he ultimately will succeed. He is, however, entitled to a genetic test for the purpose of attempting to prove that he signed it pursuant to a mistake of fact or that he is otherwise entitled to have his declaration of parentage set aside, and we reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion.

16

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLEE TO PAY COSTS.**